STATE OF NEBRASKA, APPELLEE, V.
GABRIEL S. HANSEN, APPELLANT.
562 N.W.2d 840

Filed May 9, 1997.   No. S-96-615.

J. William Gallup, of Gallup & Schaefer, for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

White, C.J., Caporale, Wright, Connolly, Gerrard, Stephan, and McCormack, JJ.

Wright, J.

Following a bench trial, Gabriel S. Hansen was convicted of first degree murder and use of a firearm in the commission of a felony. Hansen appeals.

## SCOPE OF REVIEW

A conviction in a bench trial of a criminal case is sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. The trial court's findings have the effect of a jury verdict and will not be set aside unless clearly erroneous. *State v. Emrich*, 251 Neb. 540, 557 N.W.2d 674 (1997).

To sustain a claim of ineffective assistance of counsel as a violation of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defendant, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Schoonmaker*, 249 Neb. 330, 543 N.W.2d 194 (1996); *State v. Clausen*, 247 Neb. 309, 527 N.W.2d 609 (1995). See *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

## FACTS

### Background

At approximately 12:30 a.m. on July 17, 1995, Christopher M. Savin was killed in a drive-by shooting as a result of a gunshot wound to the left side of the head. The weapon used in the shooting was a 15¼-inch sawed-off 20 gauge shotgun loaded with ¾-ounce "deer slugs." Dr. Jerry Jones, a pathologist, testified that based on the fact that he found the composite wadding from the shell embedded in Savin's left eye, the shot was fired no more than 15 feet from where Savin was standing. Hansen admitted at trial that he shot Savin, but pled not guilty to the charges because he denied that he acted with premeditation and that he intended to harm anyone.

At the time of the shooting, Savin, Charles Aguirre, Steven Hopkins, Lavon Harbour, John Dixon, and Larry Bonner, Jr., were standing near a streetlight on the southwest corner of 40th and Franklin Streets in Omaha, Nebraska. Savin was standing on the sidewalk, facing 40th Street. While they were standing there, Hopkins and Bonner noticed a white 1966 Chevy Impala drive past them heading north. Soon thereafter, they noticed the same car coming back toward them heading south. Hopkins stated that as the car came toward them, it seemed like the car was swerving closer to the curb. Bonner stated that he noticed that the car was going slower than the first time it passed them and that it was closer to the curb.

Hopkins testified that as the car came closer, someone near the back passenger window "threw a sign," which drew everyone's attention to the back window. Immediately thereafter, a shot was fired from the front passenger window. Hopkins stated that he was able to briefly see the barrel of a gun, which was pointed out the window, and that Savin was standing directly in front of the gun.

## HAMMETT'S TESTIMONY

Marcus Hammett testified that on the night of the shooting, Hansen had picked up Rufus Dennis, James Murry, and him in Hansen's Impala, and that earlier in the evening, "they was like, we gonna go dump on some slobs." He explained that this meant they were going to "[s]hoot us some Bloods." Later in his testimony, Hammett indicated that at the very least, Murry had made this statement.

Prior to the shooting, Hansen was carrying the sawed-off shotgun under the front seat of his car. According to Hammett, Hansen told Hammett that he was carrying the shotgun in his car because some members of the Bloods street gang had been shooting at him approximately 2 weeks earlier. Hammett testified that during the two nights prior to the shooting of Savin, he had gone out with Hansen, and the shotgun had been fired. First, 2 days before Savin was killed, Hammett, Dennis, Murry, and a friend of Murry's had gone with Hansen to a party. They left the party because they had gotten into a fight. As they were pulling out of the driveway, Hansen said, "[L]ight 'em up." At that time, Dennis fired the shotgun, and Murry's friend fired a

.22-caliber gun out the car windows while a group of people were standing nearby. Second, the day before Savin was killed, Hammett, Dennis, and another friend were driving with Hansen in the Impala when Hammett fired the shotgun at a house.

Hammett testified that during the shootings of the previous two nights, the shotgun had been loaded with BB shells. After Hammett fired the last of the BB shells, Hansen told him, "[T]hat ain't gonna do nothin' to nobody, so let's go get some slugs so we can do some damage, you know."

Hammett stated that on the evening of Savin's shooting, after the group had driven around for about 3 hours, they were driving down 40th Street, near Franklin Street, when they saw some people standing near a streetlight. At that time, Murry, referring to this group of people, said, "[T]here go some Trey-Eights right there. They just hit me up." Hammett explained that "Trey-Eights" was a term used for the 38th Street Bloods. According to Hammett, Murry's reference to Trey-Eights "hitting him up" meant that someone from the group "threw him" a gang sign.

Hammett testified that in response to Murry's comments, Hansen told the others that it was his turn to "blast," meaning his turn to fire the shotgun. Dennis then told Hansen that "you can't blast if you're driving," so Hansen and Dennis decided to switch places. Hansen drove a short distance down the street, pulled over, and switched seats with Dennis, so that Dennis was driving and Hansen was in the front passenger seat. Dennis then turned the car around and headed back toward the group standing near the streetlight. At this time, they were driving in the lane nearest to the curb where the group was standing.

Hammett stated that as they drove toward the first group, they noticed another group of people on the other side of the street. Murry suggested that they not go through with the drive-by shooting because the people on the other side of the street could shoot back. According to Hammett, even Hansen said, "[Y]eah, let's not do it." However, Hammett stated that as they were slowing down and Dennis was making a hand signal to turn left onto Franklin Street, Hansen yelled, "What's up, cuz?" swung the shotgun out the window, and fired. Hammett testified that the discharged shell hit him when Hansen pumped the shotgun. After Hansen fired the shotgun once, it apparently jammed,

and in Hammett's words, they were "mobbin out," or driving away quickly.

Hammett explained that "What's up, cuz?" is a phrase which identifies the speaker as a Crip. According to Hammett, if you see a Blood and you say, "What's up, cuz?" the Blood will take it as disrespect.

### HANSEN'S TESTIMONY

Hansen testified on his own behalf as to the events surrounding the drive-by shooting. He stated that he owned the Impala in question and that on the evening of July 16, 1995, he picked up Hammett, Dennis, and Murry to go "drive around" and see some girls. He stated that he did not plan on shooting anyone at that time.

Hansen testified that when he bought the shotgun used in the drive-by shooting, it had regular shotgun BB shells with it and that during the two nights prior to the shooting, the shotgun had been used to "blast." During one of these incidents, Dennis fired the shotgun as they were leaving a party, and Hansen admitted that there were people standing nearby when Dennis fired. On the other occasion, Hammett fired the shotgun at a house.

Hansen admitted that on the day of the shooting, he bought deer slugs for the shotgun. He explained that his reason for doing so was that with slugs, which contain only one large piece of metal with a hollow tip, you are less likely to hit someone than you would be firing regular shotgun shells which contain BB's. He loaded the shotgun to capacity with the deer slugs and placed it under the front seat of his car.

Hansen testified that as they were driving north on 40th Street, Murry pointed out that a group of people standing by a streetlight, which consisted of Savin and others, looked like Trey-Eights. Hansen admitted that right after Murry pointed out what he thought were Trey-Eights, Hansen said it was his turn to blast. Hansen then decided to pull the car over and switch places with Dennis so that Hansen was then sitting in the front passenger seat and Dennis was driving. Hansen testified that it was his intent at that time to "scare the shit out of" the group that Murry had pointed out. Hansen then took the shotgun out from under the front seat and placed it on his lap.

Hansen testified that everyone in the car then decided "we wasn't gonna do it." However, without explaining the apparent inconsistency, Hansen testified that as Dennis was about to make a left turn away from the group, Hansen quickly swung the shotgun out the window with one hand and deliberately fired it "up in the air." It was this shot that hit Savin just above the left eyebrow, killing him.

On cross-examination, Hansen admitted that he was in fact pointing the shotgun toward the group of people near 40th and Franklin Streets, although he denied pointing it at anyone in particular. He claimed that he did not know that anyone had been shot until he got to the police station. After the shooting, Hansen and the other occupants of the car went immediately to Dennis' house and hid the shotgun in an abandoned car in the backyard.

## Trial Court's Specific Findings

Following trial on March 14, 1996, the court announced specific findings which it stated were not intended to be all-inclusive, but merely to make a record for any reviewing court of the factors that the court found most significant in arriving at its decision in the case. The court noted that Hammett testified that Hansen had purchased the deer slugs for the shotgun and that Hansen had told the others the night before, with reference to the BB's in the shotgun, that " 'that ain't gonna do nothing to nobody, let's get some slugs that will do damage.' " The court stated that it was in the context of that remark and the events of the preceding two evenings that Hansen had purchased this "very devastating ammunition." With that in mind, the court evaluated Hammett's remark that it was Hansen's turn to blast. The court also found of particular significance "a remark that Murry apparently made earlier in the course of the evening, that 'we're gonna go dump some slobs.' " Hammett testified that he took that to mean that they were going to go and kill some Bloods.

The court found two additional matters to be of overwhelming significance. First was the fact that after spotting the group of people on the west side of 40th Street and announcing that " 'it's my turn to blast,' " Hansen traded places with Dennis. By switching to the passenger's side of the vehicle as it headed

south on 40th Street, Hansen put himself in a position where he had a clear shot at the people standing under the streetlight on the west side of the street. The second significant matter was Hansen's testimony that he had purposefully pointed the shotgun and fired it. The court found that even if the group had abandoned its intent to blast, at that point, the intent was rekindled.

The court further noted that in order to eject a shell from the shotgun, the gun must be pumped. Since the record reflected that the discharged shell flew back and hit Hammett in the chest, the court found conclusively that Hansen had both hands on the shotgun. The court stated that there was absolutely no question that Hansen pointed the shotgun in the general direction of Savin and fired, and that there was no question that the intent requisite for conviction of first degree murder was present. Thereupon, the court found Hansen guilty of first degree murder, as alleged in count I of the information, and guilty of use of a firearm in the commission of a felony, as alleged in count II of the information.

## ASSIGNMENTS OF ERROR

Hansen assigns as error that his trial counsel was ineffective in (1) failing to object to Hammett's testimony that earlier in the evening, Murry said: "[W]e gonna go dump on some slobs"; (2) failing to object to Hammett's testimony that just prior to the shooting, Murry said: "[T]here go some Trey-Eights right there. They just hit me up"; and (3) waiving a jury trial and allowing Hansen to be tried before a judge who had earlier presided over the trial of Murry, wherein the State had called Hammett as its chief witness and the judge had concluded that he was a truthful and trustworthy witness. Hansen also generally assigns as error that the convictions were not supported by the evidence.

## ANALYSIS

Hansen first argues that his trial counsel was deficient because he failed to object to Hammett's testimony that Murry stated: "[W]e gonna go dump on some slobs." Hansen claims that this statement was inadmissible hearsay and that it was extremely damaging, so much so that the trial judge specifically noted these remarks in making his comments upon rendering the judgment against Hansen. Hansen concludes:

It may be argued that there was other evidence from which that premeditation could have been inferred, but the fact that the district court singled out that specific statement and went on to say that the court found that statement to have been significant, makes any error prejudicial and prevents any fair person from saying that such an error was harmless beyond a reasonable doubt.

Brief for appellant at 13-14.

To sustain a claim of ineffective assistance of counsel as a violation of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and thereby obtain reversal of a defendant's conviction, the defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defendant, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Schoonmaker*, 249 Neb. 330, 543 N.W.2d 194 (1996); *State v. Clausen*, 247 Neb. 309, 527 N.W.2d 609 (1995). The two prongs of this test, derived from *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), may be addressed in either order.

Asserting that no reasonably competent trial counsel would have failed to object to Hammett's statement that Murry said, "[W]e gonna go dump on some slobs," Hansen argues that this evidence removed any doubt that may have rested in the mind of the trial judge with respect to the question of whether or not this was a premeditated killing.

The State, in contrast, argues that trial counsel's failure to object to Hammett's testimony did not constitute deficient performance because the testimony was admissible as an exception to the hearsay rule. Specifically, the State asserts that the statement was admissible pursuant to Neb. Rev. Stat. § 27-803(2) (Reissue 1995) to reflect Murry's state of mind at the time he made the statement. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) is not excluded from admission by the hearsay rule. See § 27-803(2).

The State argues that the statement was admissible because it clearly reflected Murry's state of mind and his intent or plan to

shoot some Bloods. However, the state-of-mind exception to the hearsay rule allows the admission of extrajudicial statements to show the state of mind of the declarant only if the declarant's then existing state of mind is a material issue in the case. See *State v. Anderson*, 245 Neb. 237, 512 N.W.2d 367 (1994). In this case, the statement in question was material if there is evidence that the declarant, Murry, conspired with Hansen regarding the shooting of Savin. However, because certain statements by a coconspirator are not hearsay under Neb. Rev. Stat. § 27-801(4)(b) (Reissue 1995), we consider whether Murry's statement falls under § 27-801(4).

Under § 27-801(4), "[a] statement is not hearsay if: . . . (b) [t]he statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." To be admissible, the statements of the coconspirator must have been made while the conspiracy was pending and in furtherance of its objects. *State v. Bobo*, 198 Neb. 551, 253 N.W.2d 857 (1977). The coconspirator exception to the hearsay rule is applicable regardless of whether a conspiracy has been charged in the information or not. *Id.*

Still, the rule is well established that before the trier of fact may consider testimony under the coconspirator exception to the hearsay rule, a prima facie case establishing the existence of the conspiracy must be shown by independent evidence. *Id.* The requirement of prima facie proof requires only enough evidence to take the question to the jury. See *United States v. Trotter*, 529 F.2d 806 (3d Cir. 1976). The purpose for this rule is to prevent hearsay evidence from being lifted by its own bootstraps, i.e., relying on the hearsay statements to establish the conspiracy and then using the conspiracy to permit the introduction of the hearsay as evidence in the case. *State v. Bobo, supra* (citing *Glasser v. United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942)).

In this case, the question is whether Hansen was deprived of his right to effective assistance of counsel when trial counsel failed to object to Hammett's testimony that Murry stated, "[W]e gonna go dump on some slobs." Regardless of whether a prima facie case of conspiracy had been established at the time Murry's statement was first introduced, we conclude that the

sum of the evidence submitted at trial, considered independently from the declaration in question, established a prima facie case of a conspiracy between Murry and Hansen. As such, the declaration would ultimately have been admissible under the coconspirator exception to the hearsay rule. Murry's statement was relevant to show the intent of the parties and was made in furtherance of the object of the conspiracy. It was made toward the accomplishment of the common object—to blast with the shotgun the parties were carrying. Therefore, trial counsel's failure to object to the statement did not deprive Hansen of his right to effective assistance of counsel.

In so holding, we note that at trial, there was evidence that on the evening of the drive-by shooting, Hansen picked up Hammett, Dennis, and Murry. In the car he was driving, Hansen carried the sawed-off shotgun which was later used to kill Savin. The previous two nights, Hansen had similarly driven his friends around in his car, and the shotgun had been used to blast. On one of these occasions, Murry was in the car when Dennis pulled out the shotgun and fired it out the window as they were leaving a party where there were people standing nearby.

According to Hammett, after two successive nights of blasting, Hansen told Hammett that the BB shells they were using "ain't gonna do nothin' to nobody, so let's go get some slugs so we can do some damage . . . ." Hansen admitted that he then bought the deer slugs for the shotgun and loaded the shotgun to capacity with the slugs during the day immediately preceding the shooting of Savin. The evidence shows that on the night of the shooting, as Hansen, Murry, Dennis, and Hammett were driving around, everyone in the car was aware that the shotgun was there. At one point, the shotgun was passed from the front seat to the back seat to see if they might be able to conceal it there.

Then, Hansen testified that as they were driving north on 40th Street, Murry pointed out that a group of people, including Savin, looked like Trey-Eights. Hammett also stated that Murry said, "[T]here go some Trey-Eights right there. They just hit me up." According to Hammett, this statement made reference to 38th Street Bloods. Hammett stated that Murry's reference to

the Trey-Eights "hitting him up" referred to "throwing" a gang sign.

In response to Murry's comments, Hansen told the group that it was his turn to blast, and he changed places with Dennis so that he was sitting on the front passenger side and Dennis was driving. From this position, Hansen was able to get within 15 feet of Savin and shoot him.

The principal element of a conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). A criminal conspiracy requires an "overt act." An overt act manifests that a conspiracy is "still at work." It tends to show a preexisting conspiracy and manifests an intent or design toward accomplishment of a crime. *Id.* However, an overt act, by itself, need not have the capacity to accomplish the conspiratorial objective and does not have to be a criminal act. *Id.*

Frequently, a conspiracy involves intricate situations and several complex acts, which makes it difficult to establish a conspiracy or conspiratorial intent by direct proof. Thus, circumstantial evidence may establish the existence of a conspiracy or the criminal intent necessary for a conspiracy. *Id.* The foregoing evidence was sufficient to independently establish a prima facie case of a conspiracy to blast at Savin and the others who were standing near the streetlight at 40th and Franklin Streets. Thus, trial counsel was not deficient in failing to object to Murry's statement, because that statement was ultimately admissible under § 27-801(4)(b).

Moreover, we reiterate that under a claim of ineffective assistance of counsel, Hansen must show that trial counsel's performance prejudiced him in such a manner that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. See, *State v. Schoonmaker*, 249 Neb. 330, 543 N.W.2d 194 (1996); *State v. Clausen*, 247 Neb. 309, 527 N.W.2d 609 (1995). See, also, *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington, supra.*

Even if Murry's statement had not been admitted, there is no reasonable probability that the result would have been different. Hansen participated in drive-by shootings during the two nights prior to the shooting of Savin. Hansen purchased the deer slugs with the intent to "do some damage." Hansen admitted that he deliberately fired at the area where the group of people was standing. Hansen had both hands on the shotgun and was no more than 15 feet from Savin. Hansen pumped the shotgun after firing the first shot, and it then jammed.

In *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995), we stated that no particular length of time for premeditation is required, provided that the intent to kill is formed before the act is committed and not simultaneously with the act that caused the death. The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed.

The trial court found Murry's remark—"[W]e gonna go dump on some slobs"—significant, but prefaced its remarks by stating that its findings were not intended to be all-inclusive and that the court found in particular two matters of overwhelming significance. First, after spotting the group of people on the west side of 40th Street and announcing " 'it's my turn to blast,' " Hansen traded places with Dennis. This placed Hansen in a position to do the shooting. Second, Hansen aimed and fired the shotgun.

One kills with premeditated malice if, before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *Id.* The intent to kill may be inferred, sufficient to support a murder conviction, from the defendant's deliberate use of a deadly weapon in a manner likely to cause death. *Id.* Even without Murry's statement, the evidence overwhelmingly establishes that Hansen killed Savin with premeditated malice. Hansen's first assignment of error is without merit.

Hansen next argues that Murry's second statement—"[T]here go some Trey-Eights right there. They just hit me up"—was inadmissible hearsay and that trial counsel's failure to object to

such testimony violated his right to effective assistance of counsel. Hansen argues that but for the admission of this statement, there would have been no evidence to indicate that anyone on the corner was a gang member, a fact that Hansen seems to concede would support a finding of premeditation.

The statement in question was not hearsay, and therefore, trial counsel's failure to object to the statement on hearsay grounds would not constitute deficient performance. Section 27-801(3) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted . . . ." An extrajudicial statement not offered to prove the truth of the matter asserted is not hearsay. *Stang-Starr v. Byington*, 248 Neb. 103, 532 N.W.2d 26 (1995).

Murry's statement—"[T]here go some Trey-Eights right there. They just hit me up"—was not offered to prove the truth of the matter asserted. It was not offered to prove that Savin and the others standing on the corner of 40th and Franklin Streets were Bloods or to prove that Murry saw them throw a gang sign at Hansen's car. The statement was offered to show Hansen's immediate reaction to the statement. Upon hearing it, Hansen said that it was his turn to blast, and he switched places with Dennis. The statement was not offered to prove the truth of the matter asserted, but was offered as relevant evidence because of its impact on Hansen. Therefore, trial counsel's failure to object to such statement cannot be said to constitute deficient performance. We determine that Hansen's second assignment of error is without merit.

Hansen also argues that his trial counsel was ineffective because he waived a trial by jury and allowed the case to be tried in front of a judge who had previously convicted Murry as an accessory to the homicide of Savin. In Murry's trial, the judge had formed an opinion that Hammett was a credible witness. Hansen contends that his conviction of first degree murder was, therefore, a foregone conclusion. We strongly disagree.

Hansen clearly has not shown that but for trial counsel's allegedly deficient performance, it was reasonably probable that the result in his case would have been different. Particularly, it has not been shown with reasonable probability that any other

judge or jury exposed to Hammett's testimony would not have found Hammett to be a credible witness in Hansen's trial. Nor has it been shown that without a finding that Hammett's testimony was credible, the result would have been different.

Moreover, the decision to waive a jury trial is ultimately and solely the defendant's, and therefore, the defendant must bear the responsibility for that decision. *State v. Journey*, 207 Neb. 717, 301 N.W.2d 82 (1981). Counsel's advice to waive a jury trial can be the source of a valid claim of ineffective assistance only when (1) counsel interferes with his client's freedom to decide to waive a jury trial or (2) the defendant can point to specific advice of counsel so unreasonable as to vitiate the knowing and intelligent waiver of the right. *Id.* Hansen has failed to present evidence of any specific unreasonable advice or interference relative to this waiver and, therefore, has failed to show that trial counsel was deficient in relation to Hansen's decision to waive a trial by jury. Therefore, this assignment of error is also without merit.

Finally, Hansen argues that the evidence was insufficient to support a finding of first degree murder because "the only real evidence of premeditation" was that supplied by the hearsay testimony which, according to Hansen, should have been excluded. Brief for appellant at 16. Hansen asserts that disregarding that evidence, the record is ambiguous with respect to the question of premeditation and that it is extremely doubtful that premeditation was proved beyond a reasonable doubt. For the reasons set forth herein, we find no merit to this argument.

We conclude that the convictions were supported by sufficient evidence. In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented, which are within a fact finder's province for disposition. A conviction in a bench trial of a criminal case is sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that conviction. The trial court's findings have the effect of a jury verdict and will not be set aside unless clearly erroneous. *State v. Emrich*, 251 Neb. 540, 557 N.W.2d 674 (1997).

The State produced sufficient evidence to prove beyond a reasonable doubt that Hansen committed first degree murder and used a firearm in the commission of a felony. The trier of fact was presented with sufficient evidence of premeditation to disbelieve Hansen's declarations to the contrary. See *State v. West*, 223 Neb. 241, 388 N.W.2d 823 (1986). Viewing all relevant admissible evidence in a light most favorable to the State, we find no reason to set aside the convictions.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.