STATE OF NEBRASKA, APPELLEE, V.
MICHAEL J. SIMS, APPELLANT.
603 N.W.2d 431

Filed December 17, 1999.   No. S-98-1343.

Scott A. Calkins, of Byam & Hoarty, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and IRWIN, Chief Judge.

STEPHAN, J.

On March 24, 1997, Michael J. Sims, then a 20-year-old resident of Omaha, Nebraska, purchased a Maverick 12 gauge shotgun, a Norinco Model SKS 7.62-mm x .39-caliber semiautomatic assault rifle, and ammunition for each from Arms & Ammo Sporting Goods in Fremont, Nebraska. On the following day, two men drove into a residential neighborhood in Omaha and fired these weapons at Nathan Coleman and William Booth. Both victims were injured, Coleman fatally. Harry Winefeldt admitted that he fired the shotgun and identified Sims as the person who fired the assault rifle. Sims was charged with first degree murder, attempted first degree murder, and two counts of use of a deadly weapon to commit a felony. Following a jury trial, Sims was convicted and sentenced on all four counts, and he now appeals.

## I. BACKGROUND

### 1. PROCEDURAL BACKGROUND

The four-count information charging Sims with the offenses for which he was convicted was filed in the district court for Douglas County on May 7, 1997. On May 8, Sims appeared for arraignment with his attorney and entered a plea of not guilty subject to a plea in abatement, which he was given leave to file within 10 days. Although it appears that a plea in abatement was filed, it is not included in the record on appeal.

Sims' appointed counsel moved for leave to withdraw on September 18, 1997, citing a "breakdown in communications" which prevented his effective representation of Sims. The district court granted the motion on September 26, but noted that Sims had elected to represent himself and therefore required his former attorney to remain in the case as Sims' technical advisor. On October 8, the court overruled Sims' plea in abatement. Sims then filed a pro se "Motion on Conflicts and Negligence of Stand by Counsel and Courts" on October 29. A hearing on this motion was held on November 4, and the matter was continued until November 10. On that date, Sims informed the court that he was "interviewing attorneys to try to retain one" and would continue pro se until he was able to secure new counsel. The court ordered Sims' original attorney to remain available as a

legal advisor if requested by Sims. On December 10, another attorney entered his appearance as counsel for Sims and his originally appointed counsel was granted leave to withdraw.

At a pretrial conference held on January 28, 1998, the court scheduled trial to begin on April 6. On that date, the State was granted leave to endorse three additional witnesses and Sims' motion for continuance was granted. Trial to a jury commenced on August 24 and continued until September 1, when the jury returned a verdict of guilty on all four counts and Sims was adjudged guilty pursuant to the verdict. A hearing on aggravating and mitigating factors was held on October 29. On November 24, Sims' motion for new trial was overruled and he was sentenced to life imprisonment on the first degree murder count, 20 to 25 years' imprisonment on the attempted first degree murder count, and 10 to 12 years' imprisonment on each of the two weapons counts. On the same date, Sims' trial counsel was granted leave to withdraw and a new attorney was appointed to represent him. Sims' newly appointed counsel perfected this timely direct appeal.

## 2. FACTS

There was undisputed evidence at trial that the two firearms Sims purchased on March 24, 1997, were used on the following day to kill Coleman and injure Booth. There was conflicting evidence regarding the events which transpired between the purchase of the weapons and the shootings.

### (a) State's Evidence

Christopher Cannon, who was 22 years old and a previously convicted felon at the time of trial, testified that on five to eight occasions, he obtained marijuana from Sims, sold it to others, and then paid a portion of the proceeds to Sims and retained the remainder for himself. He characterized this transaction as "fronting," which a law enforcement witness confirmed to be a common means of marketing illicit drugs. Cannon testified that he obtained marijuana from Sims under a "fronting" arrangement a day or two before March 25, 1997. Cannon testified that on the afternoon of March 25, he had a telephone conversation with Mikeal Gatewood during which Gatewood expressed inter-

est in purchasing one-half pound of marijuana from him. Cannon informed Gatewood that the price would be $550 and instructed him to meet him at the home of Cannon's parents, located at 2532 Hartman Avenue in Omaha, later that day to conclude the transaction. Cannon then contacted his friend Winefeldt and asked that he accompany him during the meeting with Gatewood to provide protection, as he had done during several of Cannon's prior drug transactions.

Cannon drove his blue and white 1977 Chevrolet Blazer to his parents' home where he parked in the driveway and met Winefeldt, who lived next door. Winefeldt sat in the front passenger seat of the Blazer while he and Cannon waited for Gatewood to arrive, and then Winefeldt moved to the rear seat when Gatewood and another man approached. Gatewood's companion entered the rear seat of the Blazer, and Gatewood sat in the front passenger seat. Cannon had packaged the marijuana in four cellophane bags contained within a larger bag and placed it in the console situated between the two front seats of his vehicle. Gatewood informed Cannon that he did not have enough money to conclude the transaction and stated that he would go to an automatic teller machine and return immediately. He and his companion then left while Cannon and Winefeldt remained seated in the Blazer, waiting for their return.

When Gatewood returned 15 to 20 minutes later, Cannon placed the marijuana on a cupholder where Gatewood could see it. Gatewood acted as though he was about to reenter the vehicle but instead grabbed the marijuana and fled. Knowing that Winefeldt had a weapon, Cannon told him to get out of the vehicle and "get him," referring to Gatewood. Winefeldt exited the vehicle and pointed a handgun at the fleeing Gatewood while Cannon yelled, "C'mon back with my shit." No shots were fired because Winefeldt's weapon lacked a firing pin and was therefore inoperable. Cannon observed Gatewood enter his vehicle and leave the area.

Cannon told Winefeldt that they should go after Gatewood and his companion and "smoke" them, but his attempt at immediate pursuit was thwarted by his inability to locate the ignition key to the Blazer. After he eventually found it under the seat approximately 10 minutes later, Cannon and Winefeldt drove

around the immediate area in an unsuccessful effort to find Gatewood. Cannon's testimony regarding the theft of the marijuana by Gatewood was generally corroborated by the testimony of Gatewood and Winefeldt. Winefeldt testified that following the theft, Cannon threatened to shoot Gatewood if he did not recover the marijuana.

Gatewood and Coleman had been close friends for 6 or 7 years. Gatewood had been visiting at Coleman's home, located at 3908 Ellison Avenue in Omaha, prior to his meeting with Cannon on March 25, 1997, and returned there immediately after taking the marijuana from Cannon's vehicle. Coleman was not home when Gatewood arrived sometime between 5 and 5:30 p.m., so Gatewood obtained the permission of Coleman's fiance, who also lived at the residence, to park his vehicle in Coleman's garage. Gatewood left the residence with a friend at approximately 6 p.m. to obtain materials used to smoke marijuana. When he returned a short time later, he encountered Coleman, who was walking to the door of his home. Several other persons, including Coleman's fiance and children, were also present at that time. After entering the house briefly, Gatewood went outside to watch for the blue and white Blazer because he suspected that Cannon might be searching for him in order to retaliate for the theft of the marijuana.

Cannon testified that after Gatewood took the marijuana and then eluded him, he called Joshua Hill, whom he knew to be a close friend of Sims, to determine Sims' whereabouts. He and Winefeldt then proceeded to the automotive garage where Sims worked. When they arrived there, Cannon went inside and found Sims. The two men went outside, and Cannon informed Sims of the theft of the marijuana by Gatewood. Cannon testified that Sims responded by stating, "Let's get 'em. Let's go." Cannon, Sims, and Winefeldt then left in the Blazer, stopping first at Winefeldt's home to drop off his nonfunctioning handgun and then proceeding to Sims' home near 30th and Newport Streets. Cannon testified that during this drive, he and Sims discussed the theft of the marijuana, which angered both of them.

Cannon testified that Sims briefly entered his home and returned to the vehicle carrying a box which contained a 12 gauge shotgun and an SKS assault rifle. As Sims entered the rear

seat of the Blazer, he placed the box containing the weapons on the floor. Cannon then drove to a pawnshop located near 30th and Laurel Streets and went inside to purchase cigarettes and a beverage. When he returned to his Blazer, he observed Winefeldt seated in the front seat holding the shotgun and talking on a cellular telephone, and Sims seated in the rear seat loading the assault rifle.

Cannon stated that he entered the Blazer and drove off to look for Gatewood, but was unsuccessful. At 6:34 p.m., Cannon received a page from his wife, who was in her 9th month of pregnancy. He immediately placed a call to his wife using his cellular telephone. His wife told him that she may be going into labor, so he drove directly to his home, arriving there between 6:40 and 6:45 p.m. Cannon stated that he got out of the vehicle to attend to his wife, and Sims said, "I'll handle this" as he and Winefeldt drove off in the Blazer with Sims behind the wheel.

Winefeldt testified that he remained in the Blazer while Cannon went inside the garage shop to find Sims. When Cannon and Sims returned to the vehicle, Winefeldt observed Sims carrying a box but did not observe its contents at that time. Winefeldt testified that Sims entered the rear seat of the Blazer and that Cannon drove around for a period of time, looking for Gatewood without success. He testified that they stopped at Sims' home so that he could pick up a jacket, but he did not observe Sims bring a box from his house to the vehicle. They then proceeded to the nearby pawnshop, and Cannon went inside after making a call from his cellular telephone in an effort to locate Gatewood and then handing the telephone to Sims, who completed the conversation. Winefeldt testified that after Cannon returned to the Blazer, Cannon received a page from his wife and then drove to his home, where he exited the Blazer. He stated that he and Sims then departed with Sims driving the Blazer.

Winefeldt testified that as he and Sims drove in the vicinity of 39th Street and Sorensen Parkway, he spotted Gatewood standing in front of a residence near 39th Street and Ellison Avenue. Sorensen Parkway runs parallel to Ellison Avenue and was visible from the front of Coleman's residence, which faced south. Ellison Avenue is a no-outlet street which extends west from its

intersection with 39th Street to a cul-de-sac at its west end. There are duplexes on the north and south sides of Ellison Avenue, and Coleman's residence was in the east half of the second duplex west from 39th Street on the north side of Ellison Avenue.

According to Winefeldt, Sims drove to the middle of the intersection of 39th Street and Ellison Avenue and stopped. Winefeldt testified that as two or three individuals from the Coleman residence approached the Blazer, Sims took the assault rifle from the floor of the Blazer and instructed Winefeldt to use the shotgun to shoot the approaching men before they could shoot them. Although he did not observe any weapons in the possession of the individuals who were approaching the vehicle, Winefeldt observed them raise their shirts and display gang signs. Winefeldt fired three or four shots from the shotgun, hitting both Booth and Coleman, and then opened the door of the Blazer. Winefeldt testified that he mistook Coleman for Gatewood because both were of similar build and complexion and wore their hair in a similar fashion. Winefeldt testified that after firing the shotgun, he heard shots from the assault rifle and observed Sims outside the vehicle firing at Coleman and Booth. Coleman, who was attempting to get away after being shot by Winefeldt, fell to the ground when Sims fired the assault rifle. As Sims and Winefeldt drove off in the Blazer, Winefeldt observed Gatewood, carrying a gun, come around the side of a building. Sims then took Winefeldt home.

Gatewood testified that at approximately 6:15 p.m., he spotted the blue and white Blazer heading east on Sorensen Parkway, driven by a person whom he assumed to be Cannon. He continued observing the vehicle until it was out of sight. Thirty to 45 minutes later, while standing in Coleman's front yard with Coleman and others, Gatewood observed the Blazer again, this time heading north on 39th Street and slowing as it approached the intersection of 39th Street and Ellison Avenue. Gatewood told Coleman and the others to go inside the house, and he went to the rear of a house at 3904 Ellison Avenue to retrieve a handgun he had hidden in a window well. He then walked around looking for the Blazer, but did not see it so he

returned his handgun to its hiding place and returned to Coleman's home.

A short time later, while standing near Coleman's house, Gatewood observed the Blazer again, this time southbound on 39th Street. As Gatewood went to retrieve his handgun from the window well, he heard the fire of a shotgun and someone shout, "I'm hit." He ran to the front of Coleman's home and observed Coleman crawling on his hands and knees toward his daughter. As he went to assist Coleman, Gatewood heard what he thought were "calculated" shots "fired from a different gun, a rifle of some sort, a high-powered weapon." He saw one shot hit Coleman in the lower part of his body, and a second shot impacted the back of his head. Gatewood did not observe the person or persons who fired the shots. After the gunmen had left in the Blazer, Gatewood covered Coleman with a jacket and others placed him in a vehicle and transported him to a hospital.

Gatewood admitted that he was not entirely truthful in the initial statements he made to police officers who investigated the shooting and that he initially told officers that he saw Cannon in the Blazer when he observed the vehicle in the vicinity of 39th Street and Ellison Avenue. He eventually gave police the same account of the events of March 25, 1997, as set forth in his trial testimony.

Gatewood testified that when he first observed the Blazer in the vicinity of Coleman's home on the evening of March 25, 1997, he assumed that Cannon was searching for him as a result of the marijuana theft. Gatewood acknowledged that he and his friend Coleman bore a physical resemblance to each other.

Several witnesses who were standing outside Coleman's home observed the shooting by the two occupants of the Blazer, but none were able to positively identify the person who fired the assault rifle. Coleman's fiance identified a photograph of Winefeldt as the person occupying the passenger seat of the Blazer. She described the other gunman, whom she observed exit the vehicle from the driver's seat and fire a weapon while standing at the rear of the Blazer, as "not too tall," "light-skinned," and not heavyset but of "average" build. When shown a photograph of Cannon and asked if he was the second gunman, she replied "That's surely not him." She was unable to identify

Sims as the second gunman, but stated that she did not see the person well enough to recognize him if she saw him again.

Booth testified that after observing the Blazer circle the block several times, he and Coleman approached the vehicle and raised their shirts and arms to show that they were unarmed. Although he was a gang member, Booth denied displaying any gang signs toward the occupants of the Blazer. He testified that when the Blazer stopped, he observed a person whom he did not recognize but believed to be white on the passenger side pointing a shotgun out the window. As Booth and Coleman tried to run away, Booth heard two shotgun blasts, the second hitting him in the leg. He was subsequently hit in the foot, back, and arm by several additional shots fired from the shotgun. Booth testified that one of the individuals in the Blazer wore his hair in braids and that the other appeared to be a white person of average build, "wasn't fat, wasn't skinny." He was unable to identify them further from photograph arrays shown to him by police.

Another witness who was visiting Coleman's home on the night of the shooting observed the Blazer on 39th Street on three occasions during the evening. On the third occasion, the vehicle stopped near the intersection of 39th Street and Ellison Avenue. He observed two persons in the Blazer, one a "bright-skinned fellow" with his hair braided, and another person of medium build. The person with braided hair fired first, hitting Coleman in the leg. The witness then observed a second person standing at the rear of the Blazer, firing a rifle. This person had short, dark hair and was of medium build, "[not] fat." He was unable to make a courtroom identification of this person.

Another witness, who resided on Ellison Avenue, was inside her home when she heard gunshots and stepped out to her front porch. She observed a blue and white Blazer stopped at the intersection of 39th Street and Ellison Avenue and "two shooters," one tall and skinny with long hair, and the other shorter, of medium build, with short hair. She said that the second person had a light complexion but that she could not tell whether he was Caucasian or of mixed race. She stated that this person was not a "large white guy," and further stated that the person she saw resembled Sims, but she could not be certain that it was Sims. The witness was shown a photograph of Cannon and tes-

tified that she did not see him at the time of the shooting. Another resident of Ellison Avenue observed the occupants of the Blazer at the intersection of 39th Street and Ellison Avenue as he was leaving for work at approximately 7 p.m. He described the driver as "light-complected" but not necessarily Caucasian.

On the "Firearms Transaction Record" completed by Sims on March 24, 1997, when he purchased the shotgun and assault rifle, he listed his height as 5 feet 6 inches, his weight at 150 pounds, and his race as "H." The salesperson who assisted him on that date testified that "he was quite light-skinned and could easily have been taken for a Caucasian." Cannon, who is Caucasian, is 6 feet tall and weighed approximately 285 pounds at the time of the shootings. Winefeldt had his hair arranged in "lokes," a type of braid, at the time of the shooting.

Winefeldt testified that after Sims dropped him off at his home, he called Cannon using a pager code indicating "homicide." Cannon, driving his mother's vehicle, arrived at Winefeldt's home and observed him changing his shirt and taking the braids out of his hair. While the two proceeded to the garage where Sims worked, Winefeldt told Cannon about the shootings. Sims and Shannon Johnsen were in the garage when Cannon and Winefeldt arrived. According to Cannon and Winefeldt, Sims gave Cannon a detailed verbal account of the shootings, laughing as he described the shots from the assault rifle striking Coleman's body. Cannon testified that he then returned to his home, arriving between 7:30 and 8 p.m., and subsequently took his wife to the hospital.

Winefeldt admitted that when he was arrested on the day after the shooting, he initially made false statements to police about his involvement. Later that day, however, he gave police a statement which was essentially the same as his eventual trial testimony. Approximately 1 year later, he pled guilty to manslaughter and use of a weapon to commit a felony. Winefeldt had not yet been sentenced for these offenses at the time of his testimony at Sims' trial. The State agreed not to oppose his attorney's recommendation of a term of imprisonment of 13 to 16 years if he testified truthfully.

Cannon was arrested but never charged in connection with the shootings. He stated that he had not received any "deals" or "promises" from the prosecution at the time of his trial testimony. He admitted that after his arrest, he initially lied about his involvement in the events of March 25, 1997, because he was concerned that his probation would be revoked due to his involvement in the failed marijuana transaction.

Several witnesses testified with respect to the police investigation of the crime scene. The initial call was received at 7:05 p.m., with the first officers arriving at the scene about 5 minutes later, after Coleman had been transported to a hospital, where he died. Police recovered spent 7.62-mm shell casings from the intersection of 39th Street and Ellison Avenue and an area immediately adjacent to the east. The gunshop employee who sold the assault rifle to Sims testified that the casings were from "full metal jacket" rounds not typically used for hunting purposes. Police also found internal components from shotgun shells in the same general area. Blood, hair, and an employee identification badge belonging to Coleman were recovered from the front yard of the residence. Bullet holes were found in the front door and interior of Coleman's residence. At the time of the shooting, Coleman's two young children were among the group of people gathered in front of his residence.

A police officer familiar with gang activity testified that lifting one's shirt is an ambiguous gesture which can mean either that the person is armed or unarmed. Another witness testified that Sims' fingerprints were found on Cannon's Blazer. A detective involved in the investigation testified that to the best of her knowledge, the weapons used in the shooting were never recovered, and the record does not indicate otherwise.

An autopsy revealed that Coleman sustained large wounds to his head and right leg caused by high-velocity rifle bullets. Additionally, he sustained nonfatal shotgun wounds to both legs. The cause of Coleman's death was determined with reasonable medical certainty to be "a perforating gunshot wound of the head, with massive comminuted fractures of the skull and marked lacerations and disruption of the brain."

### (b) Sims' Evidence

A homicide detective who interviewed Gatewood on the day after the shooting was called as a witness by Sims. He testified that during this interview, Gatewood stated that Cannon was one of the occupants of the Blazer when he observed it in the vicinity of 39th Street and Ellison Avenue prior to the shooting.

Johnsen, a close friend of Sims, testified that he and Hill accompanied Sims to Fremont on March 24, 1997, to purchase weapons. On March 25, he and Sims were together at the garage where they both worked, modifying suspensions on vehicles. He stated that Cannon and Winefeldt arrived at the garage at approximately 6 p.m. on that date and spoke to Sims. After they had been there a few minutes, Sims told Johnsen that "he had to go somewhere real quick." Johnsen stated that Sims returned alone about 15 minutes later and remained at the garage during the remainder of the evening. He testified that approximately 2 hours later, Cannon and Winefeldt returned to the garage and that Cannon appeared nervous while Winefeldt appeared calm. Johnsen stated that after Sims, Cannon, and Winefeldt conversed in a corner of the garage, Sims asked Johnsen to take Winefeldt to his girl friend's house, and he did so. Johnsen stated that he then returned to the garage and had a brief conversation with Sims, consisting of "normal talk," before Sims took him home. Johnsen testified that on the afternoon of March 27, he and Hill met Sims at a cemetery in Council Bluffs, Iowa, where Sims stated that he was leaving town because he was a suspect in a murder which he did not commit. However, he acknowledged that the weapons which he had purchased on March 24 were used in the crime. Johnsen testified that he knew that Sims used marijuana but had never known him to be involved in selling it.

Hill, also a friend of Sims, testified that he had never known Sims to deal in marijuana. He testified that he supplied Cannon with 2 pounds of marijuana several days before the shootings, for which Cannon paid him $500 on March 24, 1997. Hill testified that on that same day, he accompanied Sims and Johnsen to Fremont where Sims purchased the SKS assault rifle and four boxes of ammunition for Hill with $280 he had given Sims. Hill, who was 21 years old at the time of trial, explained that he

wanted the assault rifle for "[t]arget shooting . . . out in the woods somewhere." Sims used his own money to purchase the shotgun, and completed and signed the necessary documentation for both weapons. Hill stated that upon their return to Omaha, he left the assault rifle with Sims because his mother and stepfather with whom he lived did not approve of weapons in their home.

Hill testified that he next saw Sims at approximately 10:30 p.m. on March 25, 1997, and that Sims told him that Cannon had borrowed the two weapons purchased on the previous day and he had not seen them since. Hill further testified that Cannon contacted him earlier that day and told Hill that Gatewood had stolen marijuana from him and inquired about a 9-mm handgun which Cannon had recently sold to Hill. According to Hill, Cannon was "screaming, yelling, cussing" during this conversation and stated that he had just been "jacked" for a half pound of marijuana and that he was going to kill someone. Hill said he told Cannon that "if he wanted to go get the marijuana back . . . I had an SKS and Michael had a shotgun and that he could come get me from my house, and I had the 9-millimeter." He also told Cannon where Sims could be found. Hill said that he waited for Cannon to pick him up, but he never arrived.

Hill testified that he met with Sims on the day after the shooting at a motel in Council Bluffs, Iowa, and again on the following day at a Council Bluffs cemetery and that on both occasions, Sims discussed his intention to leave town because the weapons he had purchased on March 24, 1997, had been used in the shooting.

After being advised of his privilege against self-incrimination by his attorney in the presence of the trial judge and acknowledging that he understood that it was his decision whether or not to testify, Sims testified on his own behalf. He stated that he purchased the shotgun for himself and the assault rifle for Hill and that he completed the documentation for both weapons because Hill did not have his identification. Each weapon was packaged in a plain brown box. Upon their return from Fremont, Sims and Hill went to Sims' home where they removed the weapons from the boxes, observed their mechanisms, and read the instructions. Sims testified that on the following day, he gave Johnsen a ride

to work, picking him up at approximately 10 a.m. He stated that late that afternoon while he was working at the shop, Cannon approached him and asked to borrow the weapons because he had been "jacked" and needed protection. According to Sims, Cannon told him that he had been informed by Hill that Sims had the weapons in his possession.

Sims testified that he, Cannon, and Winefeldt then left the shop and drove to Winefeldt's home in Cannon's Blazer, stopping there briefly so that Winefeldt could drop off his gun. They then went to Sims' home where he retrieved the two weapons and brought them back to the Blazer. From there, they proceeded to a pawnshop on 30th Street. Sims testified that while Cannon went inside, he loaded the SKS assault rifle and determined that Winefeldt was familiar with the shotgun, which was already loaded with five rounds. Sims stated that when Cannon returned to the vehicle, Cannon took Sims back to the garage where he worked and that Cannon then left with Winefeldt and the two loaded weapons.

Sims testified that Cannon and Winefeldt returned to the garage that evening and explained that they had to dispose of the weapons, that Cannon needed to take his wife to the hospital, and that Winefeldt needed a ride to his girl friend's house. Sims said that Johnsen transported Winefeldt while he continued working and that after Johnsen returned, they cleaned the garage and went home. Sims stated that later that evening, he told Hill about Cannon's borrowing and disposing of the weapons, and Hill replied that he had heard on a police scanner that an incident had occurred involving Cannon's Blazer.

Sims testified that while at work on the following day, he learned that police were at his home, so he left the garage and had Louis Godoy take him to a motel in Council Bluffs. After meeting with Hill, Godoy, and Sims' girl friend at the motel that afternoon, Sims decided to leave town but returned to Omaha on the following day to pick up his vehicle. While there, he contacted Hill and Johnsen and asked them to meet him at the Black Angel cemetery in Council Bluffs. Sims testified that after this meeting, he drove to Chamberlain, South Dakota, but then returned to Omaha, picked up his girl friend, and went to the same motel where he had previously stayed. On the following

day, Sims turned himself in to Omaha police. Sims denied supplying or "fronting" marijuana to Cannon and further denied that he was in the vicinity of 39th Street and Ellison Avenue at the time of the shooting on March 25, 1997. On cross-examination, he acknowledged that spent cartridges found at the scene of the shooting were from shells that he loaded into the clip of the SKS assault rifle.

## II. ASSIGNMENTS OF ERROR

Sims asserts, rephrased and summarized, that (1) the State failed to present sufficient evidence to convict him of any of the crimes for which he was charged and that thus, the court erred in failing to grant his motion for a directed verdict at the close of the evidence or, alternatively, grant his motion for a new trial; (2) that his right to effective assistance of counsel was denied in that trial counsel failed to move to discharge Sims pursuant to Neb. Rev. Stat. § 29-1208 (Reissue 1995), failed to move to discharge Sims under the Sixth Amendment to the U.S. Constitution, and failed to request jury instructions regarding either uncorroborated accomplice testimony or the issue of self-defense; and (3) that the trial court committed plain error in failing to instruct the jury regarding uncorroborated accomplice testimony and self-defense.

## III. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence received at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. See *State v. Ramsay*, 257 Neb. 430, 598 N.W.2d 51 (1999).

Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a lit-

igant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Paul,* 256 Neb. 669, 592 N.W.2d 148 (1999); *State v. Woods,* 255 Neb. 755, 587 N.W.2d 122 (1998).

## IV. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE TO SUPPORT CONVICTION

▇▇ The burden in a criminal proceeding is on the State to produce proof beyond a reasonable doubt of every element of a charged offense. See, *State v. Jimenez,* 248 Neb. 255, 533 N.W.2d 913 (1995); *State v. Yelli,* 247 Neb. 785, 530 N.W.2d 250 (1995). Sims asserts that there was insufficient evidence presented at trial to convict him of any of the criminal offenses with which he was charged. Only where evidence lacks sufficient probative value as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Ramsay, supra; State v. Brunzo,* 248 Neb. 176, 532 N.W.2d 296 (1995).

#### (a) Murder in the First Degree

▇▇ Neb. Rev. Stat. § 28-303 (Reissue 1995) provides in pertinent part: "A person commits murder in the first degree if he kills another person . . . purposely and with deliberate and premeditated malice . . . ." As used in this definition, "premeditation" means "a design formed to do something before it is done." Neb. Rev. Stat. § 28-302(3) (Reissue 1995). One kills with premeditated malice if before the act causing the death occurs, one has formed the intent or determined to kill the victim without legal justification. *State v. Larsen,* 255 Neb. 532, 586 N.W.2d 641 (1998); *State v. Hansen,* 252 Neb. 489, 562 N.W.2d 840 (1997); *State v. Marks,* 248 Neb. 592, 537 N.W.2d 339 (1995). The time required to establish premeditation may be of the shortest possible duration and may be so short that it is instantaneous, and the design or purpose to kill may be formed upon premeditation and deliberation at any moment before the homicide is committed. *State v. Hansen, supra; State v. McBride,* 250 Neb. 636, 550 N.W.2d 659 (1996); *State v. Marks, supra.* The intent to kill may be inferred, sufficient to support a

murder conviction, from the defendant's deliberate use of a deadly weapon in a manner likely to cause death. *State v. Hansen, supra*; *State v. Marks, supra*.

In addition, Neb. Rev. Stat. § 28-206 (Reissue 1995) provides that a "person who aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender." Aiding and abetting requires some participation in a criminal act which must be evidenced by some word, act, or deed, and mere encouragement or assistance is sufficient to make one an aider or abettor; however, no particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *State v. Ramsay*, 257 Neb. 430, 598 N.W.2d 51 (1999); *State v. Larsen, supra*. When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable as a principal if it is shown that the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such intent. *State v. Ramsay, supra*; *State v. Larsen, supra*; *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998).

Viewing the evidence in a light most favorable to the State, as required by the applicable standard of review, we conclude that there is ample evidence to support Sims' conviction for murder in the first degree. Winefeldt testified that he observed Sims fire the shots from the assault rifle which killed Coleman. Although Winefeldt admitted that he made prior statements which were inconsistent with his trial testimony, generally such statements do not negate, erase, or eradicate the evidence that a certain fact exists. See, *State v. Campbell*, 239 Neb. 14, 473 N.W.2d 420 (1991); *State v. Schenck*, 222 Neb. 523, 384 N.W.2d 642 (1986).

We have held that a conviction may be based upon the uncorroborated testimony of an accomplice. *State v. Campbell, supra*; *State v. Loveless*, 234 Neb. 463, 451 N.W.2d 692 (1990). In this case, however, Winefeldt's testimony is corroborated by other evidence. Sims admitted that the assault rifle from which the fatal shots were fired was the same weapon which he purchased on March 24, 1997, and retrieved from his home on the afternoon of March 25 when Cannon told him that he had been

"robbed." Cannon testified that Sims produced the weapons after he told him that Gatewood had stolen the marijuana which Cannon had obtained from Sims, with the understanding of future payment, to which Sims responded angrily, "Let's get 'em. Let's go." Sims further admitted that while seated in Cannon's vehicle a short time later, he loaded the assault rifle and asked Winefeldt if he was familiar with the operation of the shotgun which he had previously loaded. Sims acknowledged that spent casings found at the scene of the shooting were from the shells he loaded into the assault rifle.

Although no witness to the shooting other than Winefeldt positively identified Sims as the person who fired the assault rifle, one witness testified that the shooter resembled Sims. In addition, several witnesses gave physical descriptions of the shooter which generally matched Sims' appearance more closely than that of Cannon.

There is evidence upon which a finder of fact could reasonably infer that Sims was an active participant in undertaking to hunt down and kill Gatewood in retaliation for the marijuana theft. There is evidence that upon learning of the theft, he was angry and exclaimed, "Let's get 'em. Let's go." Immediately thereafter, Sims retrieved the two weapons, with one already loaded, from his home. Further, there is evidence that Sims loaded the assault rifle with highly lethal ammunition, entrusted the loaded shotgun to Winefeldt after ascertaining that he knew how to use it, and then set out in search of Gatewood. Finally, there is evidence that upon observing Coleman, who resembled Gatewood, Sims told Winefeldt to fire the shotgun and then took aim at the already wounded and fleeing Coleman with a weapon that is accurate to 300 yards, killing him with a shot to the back of his head. This evidence, if believed, is clearly sufficient to sustain a finding that Sims intentionally killed Coleman purposely and with deliberate and premeditated malice.

### (b) Attempted Murder in the First Degree

At all times relevant to this action, the offense of criminal attempt was defined by Neb. Rev. Stat. § 28-201 (Reissue 1995), which provided in pertinent part:

(1) A person shall be guilty of an attempt to commit a crime if he:

. . . .

(b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

(2) When causing a particular result is an element of the crime, a person shall be guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

Much of the evidence which supports Sims' conviction for the first degree murder of Coleman is also supportive of his conviction for the attempted first degree murder of Booth. It is undisputed that Winefeldt fired Sims' shotgun at Booth, knowing that the shots could prove fatal. Sims admitted that he provided the loaded shotgun to Winefeldt and ascertained that he understood how to use it shortly before the shooting. Winefeldt testified that Sims instructed him to fire the shotgun at the group of unarmed individuals which included Booth. A finder of fact could reasonably conclude from the evidence, taken as a whole, that, acting with malice and premeditation, Sims intentionally engaged in conduct which was a substantial step in the course of conduct intended to cause Booth's death. Thus, there is sufficient evidence to sustain Sims' conviction of attempt to commit murder in the first degree.

### (c) Using Deadly Weapon to Commit Felony

At all relevant times, Neb. Rev. Stat. § 28-1205 (Reissue 1995) provided in pertinent part that "[a]ny person who uses a firearm . . . or any other deadly weapon to commit any felony which may be prosecuted in a court of this state . . . commits the offense of using a deadly weapon to commit a felony." We con-

clude that the evidence summarized above is sufficient to sustain Sims' convictions for using a deadly weapon to commit murder in the first degree and attempted murder in the first degree.

## 2. Ineffective Assistance of Counsel

Sims contends that his trial counsel was ineffective because he (1) did not move for discharge pursuant to Neb. Rev. Stat. § 29-1208 (Reissue 1995); article I, §§ 3 and 11, of the Constitution of the State of Nebraska; and the 6th and 14th Amendments to the U.S. Constitution, based upon an alleged violation of his right to a speedy trial; (2) did not request a jury instruction regarding uncorroborated accomplice testimony; and (3) did not request a jury instruction on the issue of self-defense. The Sixth Amendment to the U.S. Constitution guarantees every criminal defendant the right to effective assistance of counsel. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999); *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998). To state a claim of ineffectiveness of counsel as violative of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and thereby obtain reversal of a conviction, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Becerra, supra*; *State v. Turner*, 252 Neb. 620, 564 N.W.2d 231 (1997).

Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. When the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *State v. Lotter, supra*; *State v. Becerra, supra*. In this case, we conclude that the record on appeal affords an insufficient basis upon which to resolve Sims' claims of ineffective assistance of trial counsel and that this issue is therefore not reviewable on direct appeal.

### 3. PLAIN ERROR

Finally, Sims argues that the trial court committed plain error in (1) failing to properly instruct the jury with respect to uncorroborated accomplice testimony and (2) failing to properly instruct the jury with respect to self-defense.

Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a litigant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Paul*, 256 Neb. 669, 592 N.W.2d 148 (1999); *State v. Woods*, 255 Neb. 755, 587 N.W.2d 122 (1998); *State v. Wilson*, 252 Neb. 637, 564 N.W.2d 241 (1997).

As noted above, this is not a case involving the *uncorroborated* testimony of an accomplice. Although it was not requested at trial, Sims argues on appeal that the trial court should have given an instruction similar to NJI2d Crim. 5.6, which states:

> There has been testimony from (here insert name), a claimed accomplice of the defendant. You should closely examine (his, her) testimony for any possible motive (he, she) might have to testify falsely. [You should hesitate to convict the defendant if you decide that (here insert name) testified falsely about an important matter and that there is no other evidence to support (his, her) testimony.

> In any event, you should convict the defendant only if the evidence satisfies you beyond a reasonable doubt of (his, her) guilt.]

In this case, the trial court did instruct the jury that it was to determine the credibility of the witnesses and the weight to be given to their testimony based upon several factors, including: "[t]he interest or lack of interest of the witness in the result of this case"; "[a]ny previous statement or conduct of the witness that is consistent or inconsistent with the testimony of the witness at this trial"; and "[a]ny other evidence that affects the credibility of the witness or that tends to support or contradict the testimony of the witness." See jury instruction No. 20. The State's burden of proving guilt beyond a reasonable doubt was mentioned no fewer than 26 times in the instructions given by the court, and a separate instruction was given correctly defin-

ing the term "reasonable doubt" in the context of a criminal trial. In *State v. Huffman*, 222 Neb. 512, 385 N.W.2d 85 (1986), we rejected the defendant's contention that the uncorroborated testimony of an accomplice was insufficient to support his conviction and further concluded that there was no reversible error based upon the trial court's failure to give a specific instruction on credibility of an accomplice, where such an instruction was not requested and a general instruction on credibility was given.

In addition, the jury in the instant case was instructed that with respect to the murder and attempted murder charges, the State's burden included proving that "the defendant did not act in self-defense." Sims did not object to this instruction, nor did he request an additional instruction on self-defense. Sims' trial strategy was not to convince the jury that he shot at Coleman and Booth in self-defense, but that he did not shoot at them at all and was not even present when the shooting occurred. Under these circumstances, there is no plain error with respect to the jury instructions given by the trial court.

## V. CONCLUSION

In summary, we conclude that there was sufficient evidence to sustain Sims' convictions on each of the four offenses with which he was charged. We further conclude that the trial court did not commit plain error in instructing the jury and that Sims' allegations of ineffective assistance of trial counsel are not reviewable on direct appeal. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

HENDRY, C.J., not participating.