STATE OF NEBRASKA, APPELLEE, V.
DARREN MCCRACKEN, APPELLANT.

615 N.W. 2d 902

Filed August 18, 2000.　No. S-97-944.

Robert P. Lindemeier, of Ruff, Nisley & Lindemeier, for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. INTRODUCTION

On July 1, 1993, then 13-year-old Darren McCracken went into the bedroom of his mother, Vicky Bray; retrieved a handgun that was kept in that room; loaded the gun; and fired two shots at Bray, who was sleeping on a sofa in the downstairs family room. Later that same day, a petition was filed in the county court for Gosper County, sitting as a juvenile court, alleging that McCracken had committed acts bringing him within Neb. Rev. Stat. § 43-247(2) (Reissue 1993). On July 15, Bray died as a result of the gunshot wounds inflicted by McCracken on July 1. On November 3, the juvenile petition was dismissed, and an information was filed in the district court for Gosper County, charging McCracken with the first degree murder of Bray.

Following a jury trial, McCracken was found guilty of murder in the first degree and sentenced to life imprisonment. McCracken's direct appeal of that conviction was dismissed by this court for want of jurisdiction because McCracken did not file his notice of appeal within 30 days of sentencing. See *State v. McCracken*, 248 Neb. 576, 537 N.W.2d 502 (1995). McCracken subsequently filed a motion for postconviction relief in which he sought to have his conviction and sentence vacated pursuant to Neb. Rev. Stat. §§ 29-3001 through 29-3004 (Reissue 1995). After conducting an evidentiary hearing on McCracken's motion, the postconviction district court determined that McCracken was not entitled to a new trial but that McCracken's direct appeal from his murder conviction should be "reinstated." This appeal followed.

## II. BACKGROUND

In the early morning hours of July 1, 1993, McCracken shot Bray twice in her head. *State v. McCracken, supra*. Later that same day, a petition was filed in the Gosper County Court, sitting as a separate juvenile court; that petition alleged that then 13-year-old McCracken had committed acts which would constitute attempted first degree murder, bringing him within the ambit of § 43-247(2). McCracken sought to admit the allegations contained in the petition on July 13, but the juvenile court refused to accept his admissions and ordered McCracken to undergo a "preadjudication evaluation." See Neb. Rev. Stat. § 43-258 (Reissue 1993). Bray died on July 15, while McCracken's case was still pending before the juvenile court. *State v. McCracken, supra*.

On November 3, 1993, the county attorney for Gosper County determined that criminal charges should be filed against McCracken and made a motion to dismiss the juvenile petition, which motion was sustained over McCracken's objection. On that same day, the State filed an information in the district court for Gosper County, charging McCracken with murder in the first degree. In response to the information, McCracken's trial counsel filed a motion to quash the information and to transfer the case to juvenile court. See *id.*

During the hearing on McCracken's motion to transfer, the State introduced and the district court received exhibits 2 and 3,

which were the "preadjudication" psychiatric evaluations requested by the Gosper County Attorney and performed on McCracken pursuant to the juvenile court's order. Exhibits 2 and 3 were received without objection. At the conclusion of the hearing, McCracken's motion for a transfer to juvenile court was overruled. McCracken's motion to quash the information was likewise overruled. *Id.*

McCracken timely gave notice of his intention to proceed with an insanity defense, and the case proceeded to a trial by jury in the district court. Martin Sweeney and Rafael Tatay, M.D., testified on behalf of the State. Sweeney and Tatay were two of the individuals who had conducted "preadjudication" evaluations on McCracken pursuant to the juvenile court's order of July 13, 1993. Sweeney was a psychiatric social worker from the adolescent unit of the Lincoln Regional Center, and Tatay was a psychiatrist in the "highest offenders" unit at the Lincoln Regional Center.

Sweeney testified that there was no way to ascertain from his evaluation whether McCracken knew the difference between right and wrong on July 1, 1993, but that "there was never any time during the time [he and Tatay] were evaluating [McCracken] that he never could — that he couldn't make the distinction between right and wrong." On cross-examination, Sweeney stated that the evaluation in which he took part was intended only to ascertain whether McCracken was competent to stand trial and that a separate evaluation to which McCracken was subjected should be consulted for McCracken's mental status at the time of the crime. The State then offered as exhibit 2 that separate report to which Sweeney referred; McCracken's objection thereto was sustained, and exhibit 2 was not admitted into evidence.

Tatay then testified that he had extensively examined McCracken while the latter was being held at the Lincoln Regional Center and that he had also reviewed McCracken's medical history and school records. Tatay stated that in his opinion, McCracken knew right from wrong and knew what he was doing at the time he shot Bray. On cross-examination, however, Tatay similarly admitted that the purpose of his evaluation of McCracken was solely to determine McCracken's competency

to stand trial and was not conducted to assess whether McCracken knew right from wrong at the time he shot Bray. Tatay explained that his opinion as to McCracken's sanity was derived from his personal opinion and not from the report he coauthored with Sweeney that was admitted into evidence as exhibit 3.

In McCracken's defense, he called James Cole, Ph.D., a licensed psychologist, who offered an opinion on McCracken's state of mind at the time of Bray's shooting. Cole testified that McCracken had a "very persistent preoccupation with morbid content, with death and violence." Cole also explained that McCracken experienced this phenomenon to a greater degree than is expected of adolescents and that other tests on McCracken demonstrated emotional detachment. According to Cole, McCracken's condition was similar to posttraumatic stress syndrome in that McCracken would escape into a fantasy world when faced with stressful situations; Cole opined that McCracken's condition, however, was much worse than posttraumatic stress syndrome because of underlying weaknesses in McCracken's personality. Cole referred to McCracken's psychological condition as a "time bomb waiting to explode."

The foregoing notwithstanding, Cole concluded that McCracken exhibited no signs of neuropsychological disorder. Cole opined that McCracken's mental status had a high likelihood of deteriorating into a full-blown psychosis, due in part to the fact that McCracken was the victim of physical, sexual, and emotional abuse. Cole believed that McCracken was competent to stand trial and further explained that in retrospect, McCracken knew it was wrong to shoot Bray but that in McCracken's mind, he "thought it was the right thing to do" because of the misery Bray would suffer if he ran away from home.

Before the case was submitted to the jury and at the close of all the evidence, McCracken requested jury instructions on the lesser-included offenses of second degree murder, manslaughter, and assault in the first and second degrees; McCracken also requested that the jury be instructed on his defense of not responsible by reason of insanity. The State objected to the court's instructing the jury on any offenses other than murder in

the first degree, but did not object to McCracken's request for an instruction on his insanity defense. The district court denied McCracken's request for instructions on the lesser-included offenses, but granted McCracken's request to instruct the jury on his insanity defense.

On May 26, 1994, the jury found McCracken guilty of murder in the first degree. After the verdict was received by the district court, McCracken's trial counsel made an oral motion for a new trial, but did not specify on what basis the motion rested because he did not wish to have the motion considered by the court until after sentencing. On May 31, a written motion for a new trial was filed. On August 15, McCracken was sentenced to life imprisonment.

On September 7, 1994, after McCracken had been sentenced, the district court conducted a hearing on McCracken's motion for a new trial, which it determined had been made on May 26. The motion for a new trial was denied, and McCracken filed his direct appeal on September 28. That appeal was subsequently dismissed by this court for want of jurisdiction because McCracken did not file his notice of appeal within 30 days of sentencing. See *State v. McCracken*, 248 Neb. 576, 537 N.W.2d 502 (1995).

On September 16, 1996, McCracken filed a pro se motion for postconviction relief. The postconviction district court subsequently appointed counsel different from trial counsel, and a supplemental motion for postconviction relief was filed on January 31, 1997, in which McCracken asserted that his constitutional rights were violated and that he was entitled to a new trial. The postconviction district court held an evidentiary hearing on McCracken's motion for postconviction relief, after which the district court found, for the most part, no merit to McCracken's contentions that his constitutional rights had been violated. The postconviction court did find, however, that the failure of McCracken's trial counsel to timely prosecute McCracken's direct appeal constituted an infringement of McCracken's rights to counsel and due process; consequently, the postconviction court ordered McCracken's direct appeal to be "reinstated." McCracken's motion for postconviction relief was overruled in all other respects.

McCracken timely perfected this appeal from the order of postconviction relief. The records from both the murder trial and the postconviction proceedings are contained in the file of the instant appeal. Other testimony and facts relevant to our consideration of McCracken's "reinstated" direct appeal will be set forth as necessary in our analysis.

## III. ASSIGNMENTS OF ERROR

McCracken asserts that (1) the district court erred in refusing to transfer McCracken's case to the juvenile court; (2) the district court erred in refusing to instruct the jury on the lesser-included offenses of second degree murder and manslaughter, in violation of McCracken's constitutional right to due process and statutory right under Neb. Rev. Stat. § 29-2027 (Reissue 1995) to have the jury decide the appropriate degree of homicide; (3) the district court denied him effective assistance of counsel by not instructing the jury on the offenses of manslaughter and second degree murder because McCracken's trial counsel was precluded from arguing that McCracken was unable to form the requisite intent to commit murder in the first degree but may have been guilty of a lesser degree of homicide; (4) he received ineffective assistance of counsel at the trial level due to trial counsel's failure to object to the use of the juvenile court-ordered mental health evaluations against him in the criminal case; and (5) he received ineffective assistance of counsel at the trial level due to trial counsel's failure to file a plea in bar to preserve the issues of the juvenile court proceeding.

## IV. STANDARD OF REVIEW

■■■ Whether jury instructions given by a trial court are correct is a question of law. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000). In an appeal based on a claim of erroneous jury instructions, the appellant has the burden to show that the questioned instructions were prejudicial or otherwise adversely affected a substantial right of the appellant. *Id.*

■■■ A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. See, *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996); *State v. Ice*, 244 Neb. 875, 509 N.W.2d 407 (1994).

■ To state a claim of ineffectiveness of counsel as violative of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and thereby obtain reversal of a conviction, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999); *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998).

## V. ANALYSIS

### 1. "Reinstatement" of McCracken's Direct Appeal

■ Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *State v. Johnson*, 259 Neb. 942, 613 N.W.2d 459 (2000). The State contends that under the provisions of §§ 29-3001 through 29-3004, neither the district court nor this court has jurisdiction to grant or consider a new direct appeal from McCracken's August 15, 1994, sentence of life imprisonment. On February 3, 2000, however, this court issued an interlocutory order in which we determined that the district court properly granted McCracken a new direct appeal and that this court therefore had jurisdiction over the instant appeal. See *State v. McCracken*, 259 Neb. 1049, 615 N.W.2d 882 (2000) (published order). We ordered further briefing on the merits of this appeal and heard additional oral arguments regarding the issues on May 2, 2000. For the following reasons, we conclude, again, that we have jurisdiction to consider McCracken's instant appeal.

Section 29-3001 empowers the district court to "vacate and set aside the judgment and . . . discharge the prisoner or resentence him or grant a new trial as may appear appropriate" in the event that the court determines there has been such a denial or infringement of a prisoner's rights as to render the judgment void or voidable under the Nebraska Constitution or the Constitution of the United States. The State contends that the foregoing language of § 29-3001 provides that the *only* postconviction relief available to a prisoner who can establish that

there has been a denial of his or her constitutional rights is that the prisoner is to be discharged of the offense for which he or she was convicted or is to be granted a new trial. As we have stated in the past, however, "[w]e do not believe the Legislature intended any such restriction on the jurisdiction of the court, nor on its power to grant relief." *State v. Blunt*, 197 Neb. 82, 92, 246 N.W.2d 727, 733 (1976).

The Legislature specifically provided the district court the power to set aside a judgment if the court finds there has been a denial or infringement of the prisoner's constitutional rights sufficient to render the judgment void or voidable. See § 29-3001. That power, which obviously includes the power to void the entire criminal proceeding, including judgments on trial and on appeal, is not restricted to an "all or nothing" situation, as the State contends. See *State v. Blunt, supra*. On the contrary, we have consistently held:

> Where the evidence establishes a denial or infringement of the right to counsel which occurred only at the appeal stage of the former criminal proceedings, the District Court has jurisdiction and power, in a post conviction proceeding, to grant *a new direct appeal* without granting a new trial or setting aside the original conviction and sentence.

(Emphasis supplied.) *Id.* at 92-93, 246 N.W.2d at 734. In other words, in addition to the district court's express power to void the entire criminal proceedings, the power to grant a new direct appeal is implicit in the provisions of § 29-3001.

This court has consistently construed § 29-3001 as implicitly providing district courts the power to grant a new direct appeal since at least 1976. See *State v. Blunt, supra*. See, also, *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000); *State v. Jones*, 241 Neb. 740, 491 N.W.2d 30 (1992); *State v. Carter*, 236 Neb. 656, 463 N.W.2d 332 (1990); *State v. Chipps*, 203 Neb. 715, 279 N.W.2d 874 (1979). Notably, § 29-3001 has not been amended in light of this court's construction of the statute as tacitly providing the power to grant a new direct appeal. When judicial interpretation of a statute has not evoked a legislative amendment, it is presumed that the Legislature has acquiesced in the court's interpretation. *Sheldon-Zimbelman v. Bryan Memorial Hosp.*, 258 Neb. 568, 604 N.W.2d 396 (2000). We

therefore determine that the power to grant a new direct appeal is implicit in § 29-3001 and that the district court has jurisdiction to exercise such a power where the evidence establishes a denial or infringement of the right to effective assistance of counsel at the direct appeal stage of the criminal proceedings.

Having concluded that a district court may properly "reinstate" a direct appeal as postconviction relief, the question remains, and is presented in this case, as to how a "reinstated direct appeal" should proceed in the appellate court once it has been granted as postconviction relief by the district court. Aware that this court has never delineated how an appellant is to proceed when a district court grants a new direct appeal as postconviction relief, we deem it appropriate to provide guidance to the bench and bar for future cases.

■ The confusion in a case such as this may have resulted from language in past cases, see, e.g., *State v. Jones, supra,* which indicated that district courts may properly "reinstate" a defendant's direct appeal when the court finds that a defendant was prejudiced by ineffective appellate counsel in his or her prior criminal proceedings. Based on *State v. Blunt,* 197 Neb. 82, 246 N.W.2d 727 (1976), we conclude that a district court should more properly grant a "new direct appeal" rather than "reinstate" a past one. A defendant obtaining such postconviction relief must then appeal from his or her original conviction and sentence based on the grant of the postconviction relief. The 30-day limit within which the defendant must file his or her "new direct appeal" commences on the day that such postconviction relief is granted in the district court. Such a procedure allows the appellate court to obtain jurisdiction over the new direct appeal (assuming that the appeal is properly docketed in the appellate court within 30 days of the grant of postconviction relief), while still authorizing district courts to grant appropriate relief when the constitutional defect in the prior proceedings occurred only at the direct appeal stage. The State, of course, maintains its right to appeal the postconviction judgment of the district court.

■ When a defendant appeals, as a result of being granted a "new direct appeal" in the postconviction proceedings, the record before the appellate court would necessarily contain

the same record as if the "new direct appeal" were the original direct appeal. Additionally, the record would contain evidence that the defendant had been awarded a "new direct appeal" as postconviction relief. See *State v. Jones*, 241 Neb. 740, 745, 491 N.W.2d 30, 33 (1992) (stating that "the postconviction record is necessarily before the court as a prerequisite to this court's jurisdiction"). Notwithstanding the fact that there must be some evidence of a district court's grant of a "new direct appeal" as postconviction relief for jurisdictional purposes, an appellate court considering such an appeal must recall that "[t]ypically, only the conviction and sentencing records [are] created in the district court prior to an original direct appeal." *Id.* Consequently, only the conviction and sentencing records created in the district court are properly reviewable in a "new direct appeal." *Id.* An appellate court shall be precluded from considering any portion of the record that would not have been included in the record on the original direct appeal when considering the merits of the "new direct appeal."

Accordingly, we conclude that the district court had the power to grant McCracken a new direct appeal based upon its findings that the failure of McCracken's trial counsel to timely prosecute McCracken's original direct appeal infringed upon McCracken's right to effective assistance of counsel. Because McCracken has timely appealed pursuant to the order granting him postconviction relief in the form of a new direct appeal, this court may properly exercise jurisdiction over the instant appeal, and the State's contention to the contrary is without merit. We therefore proceed to consider the merits of McCracken's assignments of error.

## 2. DENIAL OF MOTION TO TRANSFER

In his first assignment of error, McCracken alleges that it was error for the district court to deny his motion to waive jurisdiction and transfer his case back to juvenile court. Abuse of discretion is the standard of review applicable to an appeal from a district court's denial of a motion to transfer a pending criminal proceeding to the juvenile court. *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996). Thus, we must determine whether the district court abused its discretion by denying McCracken's motion to transfer his case to the juvenile court.

McCracken filed his motion to transfer pursuant to Neb. Rev. Stat. § 29-1816 (Reissue 1995), which provides that a juvenile may move the district court to waive jurisdiction to the juvenile court and requires the court to schedule a hearing on such a motion within 15 days of the motion being made. Further, § 29-1816 states that the rules of evidence should not apply in such hearing and that "[a]fter considering all the evidence and reasons presented by both parties, pursuant to section 43-276, the case shall be transferred unless a sound basis exists for retaining the case."

In deciding whether to transfer adult criminal proceedings to juvenile court, the court having jurisdiction must carefully consider the criteria set forth in Neb. Rev. Stat. § 43-276 (Reissue 1993). *State v. Reynolds*, 247 Neb. 608, 529 N.W.2d 64 (1995). This court has stated that "in weighing such factors, there is no arithmetical computation or formula required in the court's consideration of the statutory criteria." *State v. Mantich*, 249 Neb. at 318, 543 N.W.2d at 188. Moreover, "[i]n order to retain the proceedings, the court does not need to resolve every factor against the juvenile." *Id.* "There are no weighted factors and no prescribed method by which more or less weight is assigned to each specific factor. It is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *Id.*

In the instant case, the district court went into great detail in setting forth its findings and determinations pertaining to the factors in § 43-276. The district court specifically determined that (1) the type of treatment that McCracken would be most amenable to is at a youth facility, which favored transferring jurisdiction to the juvenile court; (2) the crime involved extreme violence, which favored retaining jurisdiction; (3) the evidence of motivation for the crime (McCracken did not wish to have Bray cry when he ran away from home again) weighed neither in favor of nor against retaining jurisdiction; (4) McCracken's age of 13 years favored transferring jurisdiction; (5) McCracken had no prior criminal history, which also favored transferring the case to juvenile court; (6) McCracken's sophistication and maturity was unclear in light of the evidence presented at the

hearing, and no determination could be made either in favor of or against retaining jurisdiction; (7) the type of treatment McCracken needed could not be better obtained in either system, and this criteria weighed in favor of neither transferring nor retaining jurisdiction; and (8) "without question" the best interests of the juvenile and the security of the public require that the district court retain jurisdiction, especially since the crime was so violent and McCracken's psychiatric prognosis was so poor. The district court then concluded that "it is not appropriate that Mr. McCracken be treated as a juvenile, because of the extreme risk of danger that he presents to himself and society," and McCracken's motion to transfer was denied.

McCracken argues that the district court placed too much emphasis on factors (2) and (8), which were the only factors that favored retaining jurisdiction. McCracken acknowledges that there is no mathematical calculation or weighing of the factors, but he argues that the court-ordered psychiatric evaluations supporting factor (8) were improperly admitted. If that evidence were excluded, McCracken argues, then there is no question that his case should have been transferred back to juvenile court. Thus, McCracken contends, the district court's determination to retain jurisdiction over him was based on inappropriate evidence and, therefore, constituted an abuse of discretion.

The record is unclear as to the extent to which the district court relied upon the mental health evaluations at the hearing on the motion to transfer. Notwithstanding the admission of the psychiatric evaluations, the district court stated that " 'the best interests of the juvenile and security of the public [(factor 8)] without question [weigh] in favor of the Court continuing the court here in the District Court, because of the extremely violent nature of the actions that occurred.' "

The district court also found that the offense for which McCracken was brought to trial was of a particularly violent and aggressive nature. Further, the alleged act was perpetrated against a person rather than property. See *State v. Ice*, 244 Neb. 875, 509 N.W.2d 407 (1994). The district court also determined that McCracken was an obvious threat to the public and, if convicted, could not easily be rehabilitated or properly punished in the juvenile correctional system. See *State v. Garza*, 241 Neb.

934, 492 N.W.2d 32 (1992). The record therefore reveals that the district court's decision to retain jurisdiction rested, to a great extent, upon the nature of the offense with which McCracken was charged.

The record supports the district court's findings that the crime with which McCracken was charged was the ultimate act of violence and aggression against another human being. Based upon those findings, the district court concluded that McCracken should " 'be held accountable through proceedings in the adult criminal justice system for effective deterrence of future antisocial misconduct,' " see *State v. Nevels*, 235 Neb. 39, 51, 453 N.W.2d 579, 587 (1990), and denied the transfer to juvenile court. Our review of the record reveals that the district court properly considered the criteria delineated in § 43-276, together with the relevant evidence. The decision not to transfer the proceeding to the juvenile court is supported by the relevant evidence. In spite of McCracken's youthful age at the time of the crime, the extreme violence perpetrated upon the victim and the protection of the public in light of McCracken's poor psychiatric prognosis lead us to conclude that the district court did not abuse its discretion when it denied McCracken's motion to transfer to the juvenile court. Consequently, McCracken's first assignment of error is without merit.

### 3. REQUESTED JURY INSTRUCTIONS

McCracken next contends that the district court erred by failing to instruct the jury on second degree murder and manslaughter. McCracken maintains that the district court's failure to instruct the jury on the lesser-included offenses of second degree murder and manslaughter violated his constitutional right to due process of law and his statutory right under § 29-2027, which, he argues, entitles him to have the jury decide the appropriate degree of homicide.

Section 29-2027 provides in pertinent part that "[i]n all trials for murder the jury before whom such trial is had, if they find the prisoner guilty thereof, shall ascertain in their verdict whether it be murder in the first or second degree, or manslaughter . . . ." This court has construed § 29-2027 to mean that where different inferences as to the degree of homicide can be drawn

*from the evidence*, a court must instruct on lesser degrees. *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). In other words, when a proper, factual basis is present, a court *must* instruct a jury on the degrees of criminal homicide, that is, the provisions of § 29-2027 are mandatory. *State v. Archbold*, 217 Neb. 345, 350 N.W.2d 500 (1984). Thus, we must determine whether different inferences as to the degree of homicide may be drawn from the evidence, therefore entitling McCracken to a jury instruction on a degree of homicide other than first degree murder.

(a) Jury Instruction on Second Degree Murder

McCracken argues that the "jury was never informed that it could find him guilty of [s]econd [d]egree [m]urder or [m]anslaughter if they felt his mental condition prevented him from forming the premeditated intent required of [f]irst [d]egree [m]urder." Brief for appellant at 12-13. Because entitlement to a jury instruction on second degree murder does not necessarily entitle McCracken to a jury instruction on manslaughter, his contention raises two separate inquiries. We must first determine whether McCracken was entitled to a jury instruction on the lesser-included offense of murder in the second degree.

When determining whether to instruct the jury on a lesser-included offense, a trial court must follow the two-prong test enunciated by this court in *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). We stated in *State v. Williams*, 243 Neb. at 965, 503 N.W.2d at 566:

> [A] court must instruct on a lesser-included offense if (1) the elements of the lesser offense . . . are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.

In *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997), we noted that second degree murder is clearly a lesser-included offense of first degree murder. Thus, in regard to McCracken's request for an instruction on second degree murder, the issue is

whether there was a rational basis upon which the jury could have convicted McCracken of second degree murder while acquitting him of first degree murder. See *id.*

The primary difference between first and second degree murder is that second degree murder does not require a finding of deliberate and premeditated malice. Compare Neb. Rev. Stat. § 28-303 (Reissue 1995) with Neb. Rev. Stat. § 28-304 (Reissue 1995). Both murder in the first degree and murder in the second degree otherwise require the intentional killing of another human being. See *State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998) (noting that second degree murder occurs when one causes death of another intentionally, but without premeditation). McCracken was therefore entitled to a jury instruction on second degree murder only if there is a rational basis upon which the jury could have concluded that although he intentionally killed Bray, such a killing was without premeditation and deliberation. Such is not the case.

The report of Cole, McCracken's expert witness, was introduced at trial and states that McCracken "carefully planned" to shoot Bray long before he actually did so. In various statements after the shooting, which McCracken made to mental health professionals and police, McCracken explained that after he retrieved the gun from the upstairs bedroom, he went downstairs with the intent of shooting Bray, who was asleep on the sofa. McCracken's statements also show that he then became interested in a television show and sat down in a chair in the family room to watch television. Approximately 4 hours later when that television show was over, McCracken walked over to the couch where Bray was sleeping and put the gun to her head, firing his first shot. Bray sat up after being struck with the first shot, after which McCracken fired a second shot at Bray's head. This evidence was not controverted at trial. In addition to the foregoing undisputed evidence, shortly after he had shot Bray, McCracken admitted to police that he had planned to kill Bray around midnight, but did not actually do so until between 4 and 5 a.m.

Thus, the record is replete with evidence that McCracken possessed the requisite premeditation to be convicted of first degree murder. A thorough review of the record, however, does

not reveal any evidence from which a contrary inference could be drawn that would allow a jury to reasonably conclude that McCracken did not possess the requisite planning and deliberation for first degree murder. McCracken relied upon, and the jury was instructed on and considered, the defense of insanity. However, because all of the relevant evidence establishes that the killing of Bray was planned and deliberate, there is no rational basis upon which the jury could have drawn different inferences as to the degrees of murder from the evidence presented at trial. See, *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000); *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997); *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). Consequently, the district court was correct in its determination that the evidence provided no rational basis upon which the jury could have convicted McCracken of second degree murder while acquitting him of first degree murder. We therefore conclude that McCracken was not entitled to a jury instruction on the offense of murder in the second degree, and McCracken's assertions to the contrary are without merit.

### (b) Jury Instruction on Manslaughter

McCracken further maintains that the evidence at trial was such that he was entitled to a jury instruction on the offense of manslaughter, so that the jury could find him guilty of "[m]anslaughter if they felt his mental condition prevented him from forming the premeditated intent required of [f]irst [d]egree [m]urder." Brief for appellant at 12-13. McCracken's argument in this regard is based upon the premise that there was evidence adduced at trial upon which the jury could have concluded that McCracken lacked the ability to form the requisite intent for murder, an assertion not supported by the record.

Manslaughter differs from murder in that the former requires no intent to kill, but involves the killing of another human being while in the commission of an unlawful act or upon a sudden quarrel. See Neb. Rev. Stat. § 28-305 (Reissue 1995). In the instant case, there is no evidence, and McCracken does not argue, that Bray and McCracken were involved in a sudden quarrel just prior to the shooting; thus, the critical inquiry is whether there is evidence upon which the jury could

have concluded that Bray's death was unintentionally caused while McCracken was committing an unlawful act.

Cole testified, on McCracken's behalf, that McCracken knew what he was doing when he shot Bray and that McCracken knew it was wrong to do so. Cole's report, which was introduced at trial, states that McCracken "carefully planned the shooting, including a set of optional plans." Cole explained that McCracken followed through on this plan to kill Bray and thought it was the right thing for him to do because of the misery Bray would experience if he ran away. In other words, Cole's testimony and report unequivocally show that in Cole's opinion, McCracken intended to kill Bray, knew what he was doing when he shot her, and was well aware of the fact that his actions were wrong when he did so. Cole's testimony never challenged McCracken's ability to form the intent to kill; to the contrary, Cole's report and testimony reaffirmed that McCracken had formed such an intent. Thus, the undisputed evidence establishes that McCracken intended to kill Bray, and there simply was no evidence upon which the jury could have acquitted McCracken of first degree murder and convicted him of manslaughter.

McCracken argues that he was entitled to a jury instruction on manslaughter because the "crucial evidence at the trial," brief for appellant at 14, provides a rational basis upon which the jury could have concluded that McCracken lacked the ability to form the requisite intent for first degree murder. Contrary to McCracken's assertions, however, the record reveals that the "crucial evidence at the trial" went to whether McCracken knew right from wrong at the time he shot Bray, *not* to whether McCracken could form the premeditated intent to commit murder in the first degree. No evidence whatsoever was adduced regarding McCracken's ability, or lack thereof, to form the requisite intent to commit first degree murder; rather, the main issue upon which evidence was adduced was McCracken's sanity at the time he shot Bray. We therefore conclude that the district court properly denied McCracken's requests for jury instructions on the offenses of second degree murder and manslaughter, as the evidence did not warrant the giving of such instructions. Consequently, McCracken's second assignment of error is without merit.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

McCracken asserts in his third, fourth, and fifth assignments of error that he received ineffective assistance of counsel at the trial level. The Sixth Amendment to the U.S. Constitution guarantees every criminal defendant the right to effective assistance of counsel. *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999); *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified* 255 Neb. 889, 587 N.W.2d 673 (1999). To state a claim of ineffectiveness of counsel as violative of the Sixth Amendment to the U.S. Constitution and article I, § 11, of the Nebraska Constitution and thereby obtain reversal of a conviction, a defendant must show that (1) counsel's performance was deficient and (2) such deficient performance prejudiced the defense, that is, demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Sims, supra*; *State v. Becerra*, 253 Neb. 653, 573 N.W.2d 397 (1998).

The two prongs of the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), deficient performance and prejudice, may be addressed in either order. See *State v. Lyle*, 258 Neb. 263, 603 N.W.2d 24 (1999). Where a defendant is unable to demonstrate sufficient prejudice, no examination of whether counsel's performance was deficient is necessary. *State v. Becerra, supra*. Thus, if it is more appropriate to dispose of an ineffectiveness claim due to the lack of sufficient prejudice, that course should be followed. *State v. Lyle, supra*.

Claims of ineffective assistance of counsel raised for the first time on direct appeal do not require dismissal ipso facto; the determining factor is whether the record is sufficient to adequately review the question. *State v. Sims, supra*; *State v. Becerra, supra*. When the issue has not been raised or ruled on at the trial court level and the matter necessitates an evidentiary hearing, an appellate court will not address the matter on direct appeal. *Id.* Because the instant file contains the entire record of the trial at which McCracken was convicted and because of the particular claims of ineffective assistance of trial counsel raised by McCracken, an evidentiary hearing is not necessary to adequately develop a sufficient record for the disposition of

McCracken's claims. Thus, McCracken's claims of ineffective assistance of trial counsel may be considered in this appeal.

(a) District Court's Denial of Jury Instructions

McCracken's third assignment of error alleges that the district court's denial of his request for jury instructions on second degree murder and manslaughter had the effect of preventing his attorney from arguing to the jury that McCracken lacked the ability to form the requisite premeditated intent to commit murder in the first degree. We note that McCracken has couched this assignment of error in terms of "ineffective assistance of counsel." No Sixth Amendment issue is presented, however, as the substance of McCracken's argument is that the district court erred in denying his request for lesser-included offense instructions; McCracken's assertion that his attorney's arguments were limited is nothing more than another theory by which McCracken claims he was prejudiced by the lack of lesser-included offense instructions. As previously explained, however, there was no evidence upon which the jury could have acquitted McCracken of first degree murder and convicted him of the lesser-included offense of either second degree murder or manslaughter.

Moreover, McCracken's counsel was not, and could not be, prevented from arguing that McCracken lacked the requisite premeditated intent to commit first degree murder because of insanity or any other justification that the evidence supported. McCracken has therefore failed to show how he was prejudiced by the trial court's failure to give his requested instructions, and we conclude that this assignment of error is without merit.

(b) Reliance Upon Court-Ordered Mental Evaluations

McCracken's fourth assignment of error alleges that his trial counsel was ineffective due to counsel's failure to object to the use in his criminal trial of the mental health evaluations ordered by the juvenile court. McCracken contends that the use of the evaluations contravenes the Fifth Amendment's proscription against compelling a criminal defendant to provide evidence against himself in a criminal proceeding. The question presented in this regard is whether the district court's reliance upon the

juvenile court-ordered mental health evaluations, either at the transfer hearing or at the subsequent criminal trial, violated McCracken's right to be free from compelled self-incrimination.

### (i) Transfer Hearing

McCracken asserts that his trial counsel was ineffective by not objecting to the district court's consideration of the juvenile court-ordered psychiatric evaluations at the hearing on McCracken's motion to transfer his case to the juvenile court. McCracken argues that at the time of the hearing on his motion to transfer, he had not yet put his sanity at issue and that the evaluations were therefore "not being used to aid the Court, but to aid the State in their prosecution of the Appellant." Brief for appellant at 23. As more fully developed below, McCracken's argument is based upon a misunderstanding of the privilege against self-incrimination.

The Fifth Amendment's privilege against self-incrimination "is triggered only where there is a threat of compelled self-incrimination." *State in Interest of A.L.*, 271 N.J. Super. 192, 211, 638 A.2d 814, 823 (1994). See, also, 8 John H. Wigmore, Evidence in Trials at Common Law § 2254 (John T. McNaughton rev. 1961). The U.S. Supreme Court has provided that "[i]t is well established that the privilege protects against real dangers, not remote and speculative possibilities." *Zicarelli v. New Jersey Investigation Comm'n*, 406 U.S. 472, 478, 92 S. Ct. 1670, 32 L. Ed. 2d 234 (1972). Put another way, "[w]here there is no potential for self-incrimination, there is no Fifth Amendment concern." *State in Interest of A.L.*, 271 N.J. Super. at 211, 638 A.2d at 823. Thus, the crucial inquiry in regard to the use of the psychiatric evaluations at the transfer hearing is whether there was the potential at such a hearing for McCracken to incriminate himself.

Critical to our analysis is the exact nature of a hearing on a juvenile defendant's motion to transfer jurisdiction to the juvenile court. As articulated by the Indiana Court of Appeals in *Clemons v. State*, 162 Ind. App. 50, 58-59, 317 N.E.2d 859, 864-65 (1974), *cert. denied* 423 U.S. 859, 96 S. Ct. 113, 46 L. Ed. 2d 86 (1975):

> "Such a hearing . . . does not result in a determination of guilt as may a criminal trial; and does not directly result in

confinement or other punishment as may both a delin-
quency hearing and a criminal proceeding. In short, the
transfer hearing is not an adversary proceeding. Rather, the
sole purpose of the transfer hearing . . . is to determine
'whether best interests of the child and of society would be
served by the retention of the juvenile court authority over
him or whether the juvenile, under all the circumstances,
should be transferred to be tried as an adult.' . . ."

(Quoting *State v. Piche*, 74 Wash. 2d 9, 442 P.2d 632 (1968).) In
other words, a transfer hearing is a hearing at which the district
court considers only " 'the nature of the alleged offense,' not the
juvenile's guilt or innocence of the charged offense." *U.S. v.
Parker*, 956 F.2d 169, 171 (8th Cir. 1992). "The determination is
not one of guilt or innocence, or even of delinquency or non-
delinquency, but rather concerns the manner in which the state
elects to proceed against an alleged malefactor." *U.S. v. A.R.*, 38
F.3d 699, 703 (3d Cir. 1994). It is with the foregoing principles
in mind that we must consider McCracken's assertion that his
Fifth Amendment rights were violated at the hearing on his
motion to transfer.

In the instant case, the district court admitted the juvenile
court-ordered psychiatric evaluations at the transfer hearing to
aid in its determination of whether McCracken's case should be
transferred to the juvenile court. Section 29-1816 provides that
the rules of evidence do not apply to the hearing on
McCracken's motion to transfer. As explained elsewhere in this
opinion, § 29-1816 reflects the policy decision, made by the
Legislature, that decisions made at transfer hearings are to be
informed by all of the surrounding circumstances, which may or
may not include evidence that is inadmissible at a subsequent
criminal trial. In other words, evidence that is admitted and
relied upon by a district court at the transfer hearing may or may
not be admissible at a subsequent criminal trial. Because only
legally admissible evidence may be used to establish guilt in a
criminal trial, certain evidence that had been admitted and relied
upon by a district court at the transfer hearing would have to be
reoffered and tested for admissibility at the criminal trial.

Further, the sole purpose of the transfer hearing in the
present case was to determine whether McCracken's best inter-

ests and the security of the public would best be served by the trial court's retention of jurisdiction over him or whether McCracken's case, under all of the circumstances, should be transferred to the juvenile court. Thus, the *only* consideration made at the hearing on McCracken's motion to transfer was whether the district court should retain jurisdiction over the case or transfer the case to juvenile court; the issue of McCracken's guilt or innocence was not before the court.

"A juvenile transfer hearing is not itself a criminal proceeding," *U.S. v. Mitchell H.*, 182 F.3d 1034, 1035 (9th Cir. 1999) (citing *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966)), and there was no potential for self-incrimination at the transfer hearing. Instead, the district court considered the psychiatric evaluations for the "limited, neutral purpose" of determining whether McCracken's motion to transfer the case to juvenile court should be sustained. See *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981). Such a limited consideration of the mental health evaluations at the transfer hearing did not violate McCracken's Fifth Amendment right to be free from compelled self-incrimination, as McCracken was not forced to provide evidence at that hearing which incriminated him in any way.

Nebraska's statutory scheme is consistent with this determination. The statutes pertaining to a transfer of jurisdiction from the district court to the juvenile court require the court to consider a number of factors, which factors were considered by the district court in this case. See, § 29-1816; Neb. Rev. Stat. § 43-261 (Reissue 1998). Section 43-261 also requires that a district court faced with a decision on a motion to transfer jurisdiction to juvenile court consider those factors that are to be considered by the county attorney under § 43-276 when deciding in which court to file the juvenile's case. Further, § 29-1816 provides that the rules of evidence do not apply during a hearing held on a juvenile defendant's motion to transfer the case to juvenile court. These statutes clearly reflect a policy of allowing a court confronted with such a motion to consider all of the circumstances of a particular case before deciding whether to transfer jurisdiction to the juvenile court or retain jurisdiction. In short, § 29-1816 evinces a policy decision, made by the

Legislature regarding transfer hearings, to apply relaxed evidentiary standards so as to ensure an informed decision on a defendant's motion to transfer.

Due to the nature of the hearing on McCracken's motion to transfer and to the fact that the court therein was neither confronted nor concerned with McCracken's guilt or innocence, but, rather, with his knowledge and amenability to treatment within the juvenile system, we determine that the hearing on McCracken's motion to transfer was a hearing at which there was no potential for self-incrimination. Consequently, McCracken's Fifth Amendment privilege to be free from compelled self-incrimination was not violated by the district court's consideration of the court-ordered mental health evaluations at that hearing, and any objection made by McCracken's counsel to the introduction of the psychiatric evaluations at that hearing would have been properly overruled by the district court.

Accordingly, we conclude that the district court did not err in considering the juvenile court-ordered mental health evaluations at the hearing on McCracken's motion to transfer. See, e.g., *State v. Alexander*, 215 Neb. 478, 484, 487, 339 N.W.2d 297, 301, 302 (1983) (stating, without addressing Fifth Amendment issue, that court's decision to retain jurisdiction was based on "appropriate evidence" and that there was " 'sound basis' " for retaining jurisdiction when trial court relied upon evaluations similar to those at issue in instant case). In light of our conclusion, McCracken has failed to show that he was prejudiced by counsel's failure to object to the use of the evaluations at the transfer hearing, and his contention in this regard has no merit.

### (ii) At Trial

McCracken also contends that his trial counsel was ineffective in that counsel did not object to the use of the court-ordered psychiatric evaluations or the testimony derived therefrom at his subsequent murder trial. Relying extensively on *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), and *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984), McCracken argues that "at the time the evaluations were ordered he had not put his mental health at issue" and that "it is a violation [of] the Fifth Amendment protection against self incrimina-

tion to order an individual to be evaluated when he has not put his mental health at issue." Brief for appellant at 26. Restated, McCracken's argument is that his Fifth Amendment rights were violated at the time he was ordered to undergo the "preadjudication" psychiatric evaluations.

*State v. Vosler, supra,* involved a defendant who advised the State, prior to trial, that he intended to call two psychiatric witnesses to testify concerning his ability to form the necessary criminal intent at the time of the criminal act. The defendant did not file any written notice of an intention to plead insanity, nor did he invoke such a defense at trial. Prior to trial, the State obtained an order appointing and authorizing a qualified physician to examine the defendant. The examining physician subsequently testified at trial. After Vosler was convicted of second degree murder, he argued on appeal that the introduction of evidence derived from that court-ordered examination violated his privilege against self-incrimination and that it was error to instruct the jury on an insanity defense not raised by the defendant; this court agreed.

> [W]hen insanity has not been pled as a defense and evidence concerning the defendant's mental condition is introduced solely to establish that he lacked the ability to intend the obvious and probable consequences of his voluntary act, and thus is offered to rebut the presumption which flows from his act, the trial court should not define for the jury the elements of the insanity defense.

*Id.* at 468-69, 345 N.W.2d at 811. This court further concluded in *State v. Vosler,* 216 Neb. at 471, 345 N.W.2d at 812, that "the *introduction into evidence* of the testimony of the State-retained psychiatrist, who examined defendant under court order, violated his privilege under the fifth amendment." (Emphasis supplied.) Although *State v. Vosler* stands precisely for two propositions which relate to McCracken's assertion that his Fifth Amendment privilege against self-incrimination has been violated, neither of these propositions support his position.

We first established in *State v. Vosler,* 216 Neb. 461, 345 N.W.2d 806 (1984), that a court's order compelling a defendant to submit to a psychiatric evaluation conducted on behalf of the State, accompanied by the subsequent admission of

the test results at trial, violates the Fifth Amendment if a defendant has not invoked an insanity defense, but, rather, has sought to rely on psychiatric testimony to establish that the defendant was without the mental capacity to form the requisite intent to commit the crime with which he or she has been charged. Second, *State v. Vosler* establishes that the violation of the Fifth Amendment, if one does occur, takes place at the time that the psychiatric evidence is introduced at trial, rather than at the time the court orders the evaluation. Thus, under *State v. Vosler*, the focus of the inquiry is on the time that the evaluation was *admitted at trial* against a defendant who has not placed his or her sanity in issue, rather than on the time that the evaluation was ordered by the court.

The U.S. Supreme Court was confronted with circumstances similar to those in the instant case in *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981), which involved the elicitation of testimony regarding a court-ordered evaluation to determine a defendant's competency to stand trial. When the State called the examining psychiatrist at the sentencing phase of the defendant's trial, the defendant had raised neither the issue of his competency to stand trial nor his sanity at the time of the offense. The Court held that the admission of the testimony at the sentencing phase violated the defendant's Fifth Amendment privilege against compelled self-incrimination, explaining that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." 451 U.S. at 468. The Court further explained that had the use of the evaluation been confined to the limited purpose of determining the defendant's competency to stand trial, "no Fifth Amendment issue would have arisen." 451 U.S. at 465. In this regard, the Court distinguished *Estelle v. Smith*, a case which did not involve an insanity defense, from a case in which the defendant has pled not responsible by reason of insanity.

In *State v. Vosler*, 216 Neb. 461, 470-71, 345 N.W.2d 806, 812 (1984), we examined *Estelle v. Smith, supra*, and acknowledged that allowing court-ordered psychiatric testimony

in a trial where the defendant has not pled insanity is different from

> "a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of the offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case."

Quoting *Estelle v. Smith, supra.* Thus, this court has recognized that once a criminal defendant has placed his or her sanity at issue, the State may use the results of a court-ordered psychiatric evaluation at trial without contravening the Fifth Amendment's privilege against self-incrimination.

In the case at bar, the State introduced the testimony of Sweeney and Tatay after McCracken had invoked an insanity defense. Because McCracken had placed his sanity at issue, the State was entitled to introduce evidence to controvert his proof on that issue. See *Estelle v. Smith, supra.* Consequently, when the evidence of the psychiatric evaluations was admitted at trial, its admission ran afoul of neither *State v. Vosler* and *Estelle v. Smith* nor the Fifth Amendment, and McCracken's arguments to the contrary are without merit.

Because any objection that McCracken's trial counsel would have made to the introduction of the mental health evaluations at trial would have been properly overruled by the district court, McCracken has not shown how he was prejudiced by trial counsel's failure to object. See *State v. Becerra,* 253 Neb. 653, 573 N.W.2d 397 (1998). Because McCracken has not shown that he was prejudiced by counsel's failure to object to the mental health evaluations at either the hearing on his motion to transfer or at the subsequent trial, we conclude that his fourth assignment of error is without merit.

### (c) Failure to File Plea in Bar

McCracken next contends, in his fifth assignment of error, that he received ineffective assistance of trial counsel because his trial attorney failed to file a plea in bar to preserve the issues raised by the State in the juvenile petition. The thrust of

McCracken's claim is that he was placed in jeopardy before the juvenile court and then twice placed in jeopardy for the same offense when the State was allowed to dismiss the juvenile petition and immediately file an information in the district court.

The Fifth Amendment to the U.S. Constitution provides in pertinent part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." The Nebraska Constitution provides similar protection in article I, § 12, where it is stated, "No person shall . . . be twice put in jeopardy for the same offense." The Double Jeopardy Clauses of both the U.S. Constitution and the Nebraska Constitution protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. Spotts*, 257 Neb. 44, 595 N.W.2d 259 (1999); *State v. Howell*, 254 Neb. 247, 575 N.W.2d 861 (1998). When the Double Jeopardy Clause applies, it is the second proceeding that is constitutionally endangered. *State v. Franco*, 257 Neb. 15, 594 N.W.2d 633 (1999). Thus, we must examine the nature of the proceedings before the juvenile court, as the critical inquiry in the instant case is whether McCracken had been placed in jeopardy before the juvenile court.

In *Breed v. Jones*, 421 U.S. 519, 95 S. Ct. 1779, 44 L. Ed. 2d 346 (1975), the U.S. Supreme Court discussed the extent to which the Double Jeopardy Clause of the Fifth Amendment applied in juvenile proceedings. The Court explained that

> it is simply too late in the day to conclude . . . that a juvenile is not put in jeopardy *at a proceeding whose object is to determine whether he has committed acts that violate a criminal law* and whose potential consequences include both the stigma inherent in such a determination and the deprivation of liberty for many years.

(Emphasis supplied.) 421 U.S. at 529. The Court elaborated that there was little distinction between an adjudicatory hearing and a traditional criminal prosecution and held that "respondent was put in jeopardy at the adjudicatory hearing. Jeopardy attached when respondent was 'put to trial before the trier of the facts' . . . that is, when the [j]uvenile [c]ourt, as the trier of the facts, began

to hear evidence." 421 U.S. at 531. See, also, *U.S. v. Parker*, 989 F.2d 948 (8th Cir. 1993).

On July 13, 1993, the juvenile court inquired into whether McCracken understood his constitutional rights. Prior to proceeding to adjudication, the juvenile court ordered McCracken to undergo a preadjudication evaluation, which was requested by the State. On August 24, upon completion of the preadjudication evaluation, the juvenile court ordered further evaluations to determine if McCracken was competent to stand trial. After the further evaluations were ordered by the juvenile court, the State made a motion on November 3, 1993, to dismiss the juvenile petition. At the hearing on the State's motion, the juvenile court again refused to accept McCracken's proposed "no contest" plea and granted the motion to dismiss.

The record reflects that the only inquiries conducted by the juvenile court were into McCracken's competency to stand trial and whether McCracken understood his constitutional rights. Under *Breed v. Jones, supra*, it is clear that McCracken was never " 'put to trial before the trier of the facts' " and that the "[j]uvenile [c]ourt, as the trier of the facts, [never] began to hear evidence." 421 U.S. at 531. Thus, because McCracken's juvenile case did not proceed to adjudication, we determine that jeopardy had not attached in the juvenile court when the State's motion to dismiss was sustained. We therefore conclude that McCracken's subsequent murder trial did not violate the Double Jeopardy Clause of either the U.S. Constitution or the Nebraska Constitution.

Based upon the foregoing analysis, any plea in bar filed by McCracken's trial counsel would have been properly overruled by the district court. Consequently, McCracken has failed to establish how he was prejudiced by trial counsel's failure to file a plea in bar, and we determine that his fifth assignment of error is likewise without merit.

## VI. CONCLUSION

The district court did not abuse its discretion in retaining jurisdiction over McCracken's case and properly determined that the evidence adduced at trial did not warrant a jury instruction on a lesser degree of homicide than murder in the first

degree. Furthermore, McCracken's claims that he received inef-
fective assistance of trial counsel are without merit. Having con-
sidered all of McCracken's assignments of error and finding
them to be without merit, we affirm the judgment and the sen-
tence imposed by the district court.

AFFIRMED.